FARRELL & CO. v. THE RICHMOND AND DANVILLE R. R. CO.

*Judge's Charge—Stoppage in Transitu—Carrier's Stipulation for Lien for Arrearages—Delivery, Actual and Constructive—Priority of Liens as between Vendor, Carrier and Attaching Creditor.*

1. A charge, that if the jury believe a certain state of facts the plaintiff is not entitled to recover, while it was proper upon the general issues submitted, under the old practice, is confusing when applied to our present system. The loose practice in this respect should be discontinued.

2. The right of stoppage *in transitu* is the right of the vendor, after he has delivered goods out of his own possession and put them in the hands of a carrier for delivery to the buyer, to retake the goods before they reach the buyer's possession, upon discovering the buyer's insolvency. The right is *based* upon the plain reason of justice and equity, that one man's goods shall not be taken to pay another man's debts, and is highly favored on account of its intrinsic justice. The right *arises* solely upon the insolvency of the buyer, and such insolvency being unknown to the vendor at the *time of the sale*, and may be *exercised* at *any time* before the actual or constructive delivery of the goods to the buyer by the carrier.

3. The vendor's right of stoppage *in transitu* is paramount to all liens against the buyer, even to a lien in favor of the carrier, existing by usage, for a *general balance* due him from the consignee, and to the lien of an execution or attachment against the buyer levied before the delivery of the goods to him.

4. A vendor shipped a safe to his vendee, taking therefor a bill of lading, in which was the clause : "The several carriers shall have a lien upon the goods (shipped) for all arrearages of freight and charges due by the same owners or consignees on other goods": *Held*, that such a stipulation would not give the carrier such a lien on the safe for arrearages of freight, due by the consignee on other goods, as would take precedence of the consignor's right of stoppage *in transitu.*

5. *Quære*, whether such a stipulation as the above is reasonable and binding at all ? If it is, it is entirely subordinate to the right of stoppage *in transitu.*

6. A sold and shipped to B a safe, taking a bill of lading containing the clause quoted above. The safe was in the carrier's warehouse, and B and the carrier's agent were both leaning on it. B said to the agent, " I place this safe in your hands as security for what I owe" (alluding to arrearages of freight, due on other goods, which B owed the carrier). There was no response by the agent; but he held the safe until some time afterwards, when, hearing that B had run away, he took out an attachment on behalf of the carrier, and had it levied on the safe: *Held*, that what transpired between B and the agent did not alter, in the slightest degree, the relations existing between B and the carrier, for the reason that the carrier already had a lien on the safe for the freight on the safe, and, under the clause in the bill of lading, it claimed to have a lien on it for arrearages of freight on other goods also; and there being no *actual* delivery of the safe, or new consideration for the proposed pledge, what transpired left B and the carrier in precisely the same position as before.

7. There being no *actual* delivery of goods by a carrier to the consignee, a *constructive* delivery can only be effected by a valid agreement on the part of the carrier to hold for the consignee.

This was a CIVIL ACTION, tried before *Merrimon, J.,* and a jury, at June Term, 1888, of the Superior Court of DURHAM County.

The plaintiffs alleged, in substance, that they were residents of Philadelphia, Penn.; that they sold a safe on credit to Robertson & Rankin, of Durham, N. C.; that they delivered it to the defendant company for transportation to Durham, in said State, directed to said Robertson & Rankin ; that after said shipment, and before its delivery to the purchasers, the plaintiffs learned that the purchasers were insol-

vent, and that they notified the defendant not to deliver the safe to said purchasers, or any other person but the plaintiffs, at the same time tendering to defendant the freight and all other charges on said safe, and demanding the delivery thereof; that defendant refused to surrender said safe, but retained the same wrongfully, &c.

As there was no objection to the issues, only so much of the answer of the defendant as relates to them and the exceptions will be stated. The answer denied that defendant wrongfully withheld the said safe from the plaintiffs, and alleged that Robertson & Rankin, being indebted to defendant in the sum of $130, defendant sued out a warrant of attachment against the said property before defendant had any notice of the plaintiffs' claim on said safe, and before any demand made by them for the same, and that under the judgment and execution in said proceeding, defendant purchased said safe. Defendant also alleged that after the safe was received at its warehouse in Durham, it was delivered to Robertson & Rankin, and by them delivered to Col. J. A. Holt, agent of defendant at Durham, to be held by him as security for certain indebtedness then due and owing to the defendant by the said Robertson & Rankin.

The following issues were submitted to the jury:

1. Did the defendant deliver the safe to Robertson & Rankin?

Answer. No.

2. If it was delivered, did the plaintiffs demand possession before it was delivered, and tender freight and charges as alleged in the complaint?

Answer. Yes.

3. What damage, if any, have plaintiffs sustained?

Answer. One hundred dollars, with interest from September 10, 1885.

The plaintiffs introduced the deposition of Jordan Matthews, as follows:

I am a member of the firm of Farrell & Company; the other members of the firm are John Farrell and George L. Remington. The business of the firm is manufacturing and selling fire-proof and burglar-proof safes; our agent in May, 1885, for the State of North Carolina, was E. F. Hall, of Greensboro, N. C. Through him we sold a No. 5 Champion safe, at one hundred dollars, at Philadelphia, to the firm of Robertson & Rankin, of Durham, N. C., upon an order dated May 21, 1885, signed by Robertson & Rankin (witness produces and identifies the order referred to, marked "Exhibit A"). By the terms, "at Philadelphia," which I have just used, I mean that we deliver the safe free on board at Philadelphia, and the purchaser pays the freight. [We delivered the safe to the steamship company named in the order, only in the capacity of a common carrier; when the safe was shipped we believed Robertson & Rankin to be solvent; otherwise we would not have shipped it.] I did not personally stop the delivery of the safe. [That I believe was done by our agent, Mr. Hall. *It was within the scope of the authority given by us to the said agent to stop the delivery of any safe shipped to any person,* upon the discovery that the vendee was insolvent.] Robertson & Rankin have never paid us a cent for this safe. [We have taken no security for the payment of the safe except the printed clause in the order reserving the title to us until the safe should be paid for.]

The defendant objected to that portion of the foregoing testimony embraced within brackets. The Court overruled the objections, and permitted the entire deposition to be read, and the defendant excepted. No point was made as to the right of the defendant to object, it being admitted that, by an agreement made when the deposition was opened, the defendant had the right to make the objections on the trial.

"EXHIBIT B."

THE ASSOCIATED RAILWAYS OF VIRGINIA AND THE CARO-
LINAS—PIEDMONT AIR-LINE—BILL OF LADING.

PHILADELPHIA, 6—14, 1885.

Received by Philadelphia and Richmond S. S. Line (the Clyde S. S. Co.), of Farrell & Co., under the contract hereinafter contained, the property mentioned below, marked and numbered as per margin, in apparent good order and condition (contents and value unknown). viz.:

Marks and numbers: One iron safe, 1184, shippers' weight.

\*      \*      \*      \*      \*      \*      \*

The several carriers shall have a lien upon the goods specified in this bill of lading for all arrearages of freight and charges due by the same owners or consignees on other goods.

The above extracts, and all of "Exhibit B," which is necessary to an understanding of this case.

W. W. Fuller, witness for plaintiffs, testified: That a few days before the sale of the safe, E. F. Hall, plaintiffs' agent, and W. W. Fuller, plaintiffs' attorney, went to the depot of the Richmond and Danville Railroad Company, in Durham, saw the safe in the warehouse covered with bagging, marked to Robertson & Rankin, from Farrell & Co., and demanded the delivery to Hall and Fuller of the safe, at the time asking the amount of freight and charges thereon, which amount not being given, they tendered to Col. Holt, agent of defendant, a sum of money not less than ten dollars, and offered to pay said freight and charges. Col. Holt refused to receive the money or to deliver the safe.

Plaintiffs rested, it being agreed that they might later give evidence of the insolvency of vendees of the safe at time of demand by Hall and Fuller.

John A. Holt, witness for defendant, testified: That he was agent at Durham station for the defendant company, and was such agent at the time the safe was received at the warehouse; Robertson & Rankin were and had been receiving a lot of lumber, the freight on which amounted to considerably over one hundred dollars, which was then owing by them to defendant company; witness had been sending to them demanding payment of these freight bills, and had seen them in person about it; that he went down the side track we term "lumber track," and found they had been taking off lumber, after having been notified not to do so; that he had sent for Robertson, whom he knew to be the one attending to the firm's business He came down to the warehouse, and witness met him at the upper end of the warehouse, where safe was standing; asked him if I had not notified him time and again not to remove any lumber without first paying the freight. He said I had. I told him he had placed himself in a very bad situation, and that I was compelled to take steps against him. We were then standing right beside the safe, both of us leaning upon it. He said, " Colonel, here is a safe I paid one hundred dollars for in Philadelphia. It is true I have disappointed you in my promises about coming to pay you those freight bills, but I have been disappointed myself in not receiving money." He mentioned about having a large amount of money at several places, and said, pointing in the direction of Webb & Kramer's warehouse, that he was having an office put up there, and it would be completed the next day, or the day after. He then said, placing his hand on the safe, " I place this safe in your hands as security for what I owe, until the next day, or the day after, when my office will be completed, and I will come and pay all freight bills and remove the remnant of lumber and the safe, and take it over to my office." I held the safe till some little time after that, when I got news that he had run away. This was before the time Mr.

Fuller came after it—some weeks before—may have been a month or two months—considerable time—don't remember exactly what time it was.

*Cross-examination*: The safe came about the 9th or 10th June; had been here three, four or five weeks before my conversation with Robertson. The defendant sold the safe on the 10th of same month, either August or September. The place where Robertson came, at the warehouse, was the same place where the safe was first placed. Robertson & Rankin were notoriously insolvent here when Mr. Fuller came and made demand, and had been so long before. Defendant has no receipt from Robertson & Rankin for the safe. Defendant took out attachment proceedings after Robertson & Rankin left here, and levied upon the safe, under the proceedings, as Robertson & Rankin's, and it was afterwards sold under these proceedings, and bought by the defendant, who paid nothing for it, but credited Robertson & Rankin on their debt to the defendant. It is a rule of the defendant company not to deliver goods to any one without their signing receipt and paying freight.

*Re-direct*: At the time the safe was shipped to Robertson & Rankin, they were entirely solvent.

*By the Court*: It is a rule of the defendant company not to deliver goods until the freight is paid. I had the power, and could have delivered it, but it would have been disobeying orders, and would have thrown the entire responsibility on me. I was seeking to secure the freight on the lumber as well as on the safe. It is also a rule of the defendant that if the freight is not paid in thirty days, notice is given to the shippers to pay. The safe had been in the warehouse fully thirty days before Robertson pledged it to me, but no notice had been given the plaintiffs by me. I do not remember positively about this—it was some two, three or four weeks; never made any memorandum of it. I meant

to say the safe was in the warehouse thirty days before it was sold under the attachment.

The defendant asked the following special instructions:

"1. That upon the testimony the plaintiffs are not entitled to recover."

Refused, and defendant excepted.

" 2. That if the jury believe the testimony of Col. Jno. A. Holt, they must respond to the first issue, ' Yes,' and to the second issue, ' No.' "

Refused, and defendant excepted.

" 3. That if the jury shall find that Robertson & Rankin were insolvent at the time the safe was shipped to them by the plaintiffs, the plaintiffs are not entitled to recover."

Refused, and defendant excepted.

His Honor charged the jury that there was no evidence that Col. Holt, the defendant's agent, was authorized to accept the safe from Robertson & Rankin as a pledge to secure the freights due on the safe and lumber by them to the defendant; and even if he was authorized so to do, that what transpired between Holt and Robertson did not amount to a delivery of the safe to Holt, and was not sufficient to deprive plaintiffs of any rights they might acquire in respect to the safe; that while the defendant might ratify Holt's act, if there was any pledge, yet, if the safe had been pledged, the jury might consider the fact that the defendant took out attachment proceedings against Robertson & Rankin as evidence of the repudiation by defendant of any contract or pledge; that if the jury should find that the plaintiffs, or any of them, knew, or had reason to know, that Robertson & Rankin were insolvent at the time the safe was shipped, the plaintiffs are not entitled to recover.

His Honor then instructed the jury that there was no evidence of any delivery of the safe to the defendant, or its agent authorized for such purpose, and directed them to

answer the first issue in the negative and the second in the affirmative.

The defendant excepted to the charge of the Court, and to the instructions given the jury.

The jury rendered a verdict as set out in the record.

Motion by defendant for new trial. Motion overruled.

Appeal by defendant.

Upon the appeal taken in the above entitled action, the defendant assigns as errors:

1. The admission in evidence of the portions of the deposition of Jordan Matthews objected to by defendant.

2. The refusal of the Court to give the special instructions asked by the defendant.

3. That the Court erred in instructing the jury that Holt was *unauthorized* (?) to accept the safe from Robertson & Rankin as a pledge, and that even if he was authorized, what transpired between Holt and Robertson did not amount to a delivery of the safe to Holt, and was not sufficient to deprive plaintiffs of any rights they might acquire in respect to the safe.

4. That the Court erred in instructing the jury that they might consider the fact that the defendant took out attachment proceedings against Robertson & Rankin, as evidence of the repudiation by defendant of any contract of pledge.

5. That the Court erred in instructing the jury that there was no evidence of any delivery of the safe, and in directing the jury to answer the first issue in the negative and the second in the affirmative.

There was a verdict for the plaintiffs.

*Messrs. E. C. Smith* and *W. W. Fuller*, for the plaintiffs.
*Messrs. D. Schenck* and *C. M. Busbee*, for the defendant.

SHEPHERD, J. (after stating the case). Several objections were made to the testimony, all of which we think were

properly overruled. That which relates to the witness speaking of the contents and effect of " Exhibit A," would have been tenable, but as the exhibit was subsequently introduced, and was entirely consistent with the witness' statement, the defendant was in no wise prejudiced, and the exception is therefore without merit.

It is proper to notice that the third instruction asked by the defendant was, that if the jury should believe a certain state of facts, " the plaintiffs are not entitled to recover."

The same words are used by the Court in one of the instructions given. Such language is not pertinent to any of the issues submitted.

These present questions of fact, or mixed questions of law and fact, and upon the findings, it is for the *Court* to say whether or not the plaintiffs are entitled to recover. Such instructions were proper upon the general issues submitted, under the old practice, but are confusing when applied to our present system.

It is true that in the present case no harm has resulted, as we can dispose of the appeal upon the testimony of the defendant; but we have adverted to this improper manner of asking for and giving instructions, in order that the loose practice in this respect may be discontinued. We can very readily conceive how juries may be perplexed and misled by such general charges when they come to pass upon the *specific* issues submitted to them, and how new trials may be thus made necessary, which could otherwise have been easily avoided.

The plaintiff's right is based upon this alleged right to stop the property *in transitu.* This right " arises solely upon the insolvency of the buyer, and is based upon the plain reason of justice and equity, that one man's goods shall not be applied to the payment of another man's debts. If, there-

fore, after the vendor has delivered the goods out of his own possession, and put them in the hands of a carrier for delivery to the buyer (which, as we have seen * * is such a constructive delivery as divests the vendor's lien), he discovers that the buyer is insolvent, he may retake the goods if he can, before they reach the buyer's possession, and thus avoid having his property applied to paying debts due by the buyer to other people." * *  It is " highly favored on account of its intrinsic justice." Benjamin on Sales, 2 vol., secs. 1229–1231. It " is but an equitable extension or enlargement of the vendor's common law lien for the price, and not an independent or distinct right." *Note to sec.* 1229, *supra.* " It is quite immaterial that the insolvency existed at the time of the sale, provided the vendor be ignorant of the fact at the time." *Loeb* v. *Peters,* 63 Ala., 243, and a number of cases cited in note to sec. 1244 Benj. on Sales, *supra.*

These last authorities fully sustain his Honor in refusing the third instruction asked by the defendant. The mere fact that Robertson & Rankin, the consignees, were insolvent at the time of the sale, could not defeat the lien of the plaintiffs, unless they knew of such insolvency.

The charge, as given, was correct in this particular, the jury having found, substantially, that the plaintiffs were, nothing further appearing, entitled to avail themselves of the right of stoppage *in transitu,* and that they exercised that right through their agent, Mr. Fuller. We will now consider the several defences made by the defendant. No agreement or usage having been shown to the contrary, the right of stoppage *in transitu* continued until the safe was actually or constructively delivered to the consignee. Benjamin on Sales, vol. 2, sec. 1269; *Hause* v. *Judson,* 29 Am. Dec., 377, and notes.

1. The first defence, though not seriously pressed upon the argument, is, that the defendant acquired title by reason

of the sale under the attachment proceedings instituted by it against the consignee for arrearages of freight due on lumber.

" The vendor's right of stoppage *in transitu* is paramount to all liens against the purchaser " (Hilliard on Sales, 289 ; *Blackman* v. *Pearce*, 23 Cal., 508), " even to a lien in favor of the carrier, existing by usage, for a general balance due him from the consignee." *Oppenheim* v. *Russell*, 3 Bos. & Pul., 42. * * *

" An attachment or execution against the vendee does not preclude the stoppage *in transitu*, for this is not a taking possession by the vendee's authority, the proceeding being *in invitum*." Note to *Hause* v. *Judson*, *supra*, where a large number of authorities, sustaining the text, is collected. These authorities conclusively settle that the defence under the attachment proceedings cannot be maintained.

2. The second defence rests upon the following clause of the bill of lading: " The several carriers shall have a lien upon the goods (shipped) for all arrearages of freight and charges due by the same owners or consignees on other goods."

The counsel for the defendant could give us no authority in support of this defence, and none, we think, can be found, to the effect that such a stipulation should be construed to take away this " highly favored " and most important right of the vendor to preserve his lien, in order that his goods may " not be applied to the payment of another man's debts," much less to those of his agent, to whom he delivers them for carriage. Shippers would hardly contemplate that in accepting such a bill of lading the well established and cherished right of stoppage *in transitu* was to be made dependent upon whether a distant consignee was indebted to the carrier, and the commercial world would doubtless be surprised, if it were understood that whenever such a stipulation was imposed upon consignors, they were in effect

102—26

yielding up their lien for the purchase money and substantially pledging their goods for the payment of an existing indebtedness due their agent, the carrier, by a possible insolvent vendee.

If such is the proper construction, we can well appreciate the language of Lord Alvanly, in *Oppenheim* v. *Russell*, 3 Bos. and Pul., 42, when he said that he hoped it would "never be established that common carriers, who are bound to take all goods to be carried, for a reasonable price tendered to them, may impose such a condition upon persons sending goods by them."

He doubts whether an express agreement between the carrier and the consignor would be binding, and BEST, J., in *Wright* v. *Snell*, 5 B. and Ald., 350, in speaking generally of such contracts, said he doubted "whether a carrier could make so unjust a stipulation." Chancellor Kent, in the second volume of his Commentaries, remarks that "it was again stated as a questionable point in *Wright* v. *Snell*, whether such a general lien could exist between the owner of the goods and the carrier, and the claim was intimated to be unjust. It must, therefore, be considered a point still remaining to be settled by judicial decision." It is unnecessary, however, for us to say whether such a condition or agreement would be reasonable and binding, as it seems very clear that the present case is not susceptible of the construction contended for, and that it is entirely subordinate to the right of stoppage *in transitu*. The exercise of this right revested the right of possession in the plaintiffs, and they, having tendered all *they* owed the defendant, no interest was ever acquired by the vendee to which the claim of the defendant could attach.

3. The third and most plausible defence is, that, according to the testimony of the agent Holt, there was a constructive delivery to the consignee, and that this defeated the rights of the plaintiffs. The doctrine is well settled that

" where goods are placed in the possession of a carrier to be carried for a vendor, to be delivered to the purchaser, the *transitus* is not at an end until the carrier, by agreement between himself and the consignee, undertakes to hold the goods for the consignee, not as carrier, but as his agent, and the same principle will apply to a warehouseman or a wharfinger." Benjamin on Sales, *supra.* Was there any such agreement in this case ? The most that can be said is that the consignee offered to pledge the safe to the defendant for the freight already due on lumber. There was no *actual* change of possession. The safe was in the defendant's warehouse, and Holt, the agent, and the consignee, were both leaning upon it. The consignee, placing his hands on it, said : " I place this safe in your hands as security for what I owe." There was no response whatever by Holt. He simply states that he " held the safe till some little time afterwards," when he heard that the consignee had run away, and that he sued out the attachment proceedings mentioned in the answer.

The majority of us are doubtful whether there was reasonably sufficient evidence to be submitted to the jury upon the question of the acceptance of the offer, and of delivery.

There being no *actual* delivery, a *constructive one* can only be effected by a *valid* agreement, on the part of the common carrier, to *hold for the consignee.*

Mr. Benjamin, from whom we have so largely quoted, says, that " the existence of the carrier's lien for unpaid freight raises a strong presumption that the carrier continues to hold the goods as carrier, and not as warehouseman ; and in order to *overcome this presumption* " (the italics are ours) " there must be proof of some arrangement or agreement between the buyer and the carrier, whereby the latter, while retaining his lien, becomes the agent of the buyer to keep the goods for him."

But, conceding that the acquiescence of Holt was some evidence of the acceptance of the offer, would this in law amount to such a delivery as would defeat the plaintiff's right?

Passing by the question, as to whether the defendant bailee was not estopped to set up such a transaction in favor of itself, and against its principal (2 Wait's Act. and Def., 57); and also the fact that the alleged agreement was *not* to hold as agent of the vendee, but for itself, we are of the opinion that what transpired between the defendant's agent and the vendee did not alter in the slightest degree the relation in which they stood to each other.

It will be borne in mind that there was no *actual* delivery ; that the defendant had a lien for the freight due on the property, and, under the stipulation in the bill of lading, it had, *as against the consignee,* also a lien for the arrearages of freight due by him. There was no *new consideration*, and the proposition of the assignee, and its alleged acceptance by the defendant, left them in *precisely the same position as before.*

It amounted virtually to the defendant saying, "if you will pay the freight and arrearages, I will deliver you the safe." This was, as we have seen, the effect of the bill of lading. In the leading case upon this subject, *Whitehead* v. *Anderson*, 9 M. and W., 517, cited with approval by Benjamin, *supra*, the agent of the consignee went on board of the ship, when she arrived in port, and told the captain that he had come to take possession of the cargo. He went into the cabin, into which the ends of the timber projected, and saw and touched the timber. When the agent first stated that he came to take possession, the captain made no reply, but subsequently, at the same interview, told him that he would deliver him the cargo when he was satisfied about his freight. They went ashore together, and shortly after, an agent of the consignor served a notice of stoppage *in transitu* upon the mate, who had charge of the cargo: *Held,* "that,

under these circumstances, there was no *actual* possession taken of the goods by the consignees, and that as there was no contract by the captain to hold the goods, as their agent, the circumstances did not amount to a constructive possession of the goods by them.   There is no proof of any such contract.   A promise by the captain to the agent of the consignees is stated, but it is no more than a promise, without a *new consideration,* to fulfill the original contract, and deliver in due course to the consignees, on payment of freight, which leaves the captain *in the same situation as before.*   After the agreement, he remained a mere agent for expediting the cargo to its original destination."

This, it seems to us, is conclusive of our case.   Here there was no new consideration whatever moving from the vendee, nor was there any definite understanding that the defendant was to forbear pressing the vague proceedings suggested by him.   I Addison on Contracts, 1 vol., 2, note.

There was, therefore, no new contract, and the defendant held the safe in the same character as he did before, when, as we have shown, it was subject to the paramount claim of the plaintiffs.   We have been able to find no case where a pledge of this kind has been asserted, but we have observed that all the cases we have examined lay down the rule that constructive delivery is only made by the carrier, either agreeing expressly, or by implication, to hold as the agent of the *consignee.*

While the amount involved in this suit is small, we have thought it our duty, in view of the importance of the questions of law presented, to carefully examine many of the multitude of cases upon the subject, and our conclusion is that his Honor was correct in telling the jury that what transpired between Holt and Robertson (one of the consignees) did not amount to a delivery, and was not sufficient to deprive the plaintiffs of any rights they might acquire in respect to the safe.

No error.                              Affirmed.