No. 1,555.

## ROGERS ET AL. *v.* SCHNEIDER.

PRACTICE.—*Instructing Jury what Verdict Should Be.—When Permissible.*—If the controlling facts are all admitted, or are undisputed and but one reasonable inference can be drawn, it is not error for the court to instruct the jury what the verdict should be.

SALE.—*Stoppage in Transitu. — When Transit Terminates. —* A clear and unequivocal case of the termination of the transit should be made out by the evidence before the vendor should be deprived of his right of stoppage *in transitu.* The transit does not necessarily end upon the arrival of the goods at the point of their destination, but continues so long as they remain in the possession and control of the carrier as such.

SAME.—*Carrier.—Constructive Delivery.—Stoppage in Transitu.—* The carrier may convert himself into an agent for the vendee, or receive and store the goods as a warehouseman, and thus terminate the transit before the goods come into the actual possession of the vendee, which constitutes constructive delivery and terminates the vendor's right of stoppage *in transitu.*

SAME.—*Stoppage in Transitu.—Law and Fact.—Province of Jury.* —If the evidence is conflicting upon the question of whether the transit had ended at or prior to a given time, or if the facts are undisputed and two reasonable inferences arise therefrom, it is within the province of the jury to determine the conflict and to draw the inference.

SAME.—*Stoppage in Transitu.—Purchase Money Notes.*—The fact that the vendor took the notes of the vendee for the purchase-money of the goods does not deprive the vendor of the right of stoppage *in transitu.*

From the Marion Circuit Court.

*S. Claypool* and *J. W. Claypool,* for appellants.

*W. A. Van Buren* and *L. C. Walker,* for appellee.

LOTZ, J.—This action involves the right of a vendor of personal goods to stop and retake them while in transit to the vendee. It arises in an action to recover

the possession of the goods, brought by the appellee against the appellants. Rogers, Brown & Co. was a co-partnership engaged in selling iron. The Southside Foundry Co. was a co-partnership engaged in manufacturing iron in the city of Indianapolis. About the 20th of April, 1893, Rogers, Brown & Co. sold to the Southside Foundry Co. forty-seven tons of pig iron. The sale was made on four months time, and the Southside Foundry Co. executed its notes payable to the vendors for the purchase-price. The iron was shipped by rail from Ensley, Alabama, to Indianapolis, and arrived on board two cars at the freight yards of the Pennsylvania Railroad Co., in said city, sometime in the month of May, 1893. The cars containing the iron remained standing in the yards for the period of fifty-one days. The railroad company frequently made demands upon the consignees for the payment of the freight, but the freight was not paid. The railroad company also charged one dollar per day for each car as demurrage, or car service. Sometime in the month of July the railroad company at the request of the consignee placed the two cars containing the iron at another place in its yards, being the place where it was customary to unload such iron; and the servants and employes of the Southside Foundry Co., with the permission and consent of the railroad company, did unload the cars, by throwing the iron upon the ground and piling it up in the yards of the company near the railroad track. On the 12th day of August, 1893, the Southside Foundry Co. became and was insolvent. Rogers, Brown & Co. learning of such insolvency on that day served notice upon the railroad company not to deliver the iron to the Southside Foundry Co. and directed it to hold the iron subject to further orders from them. On the same day the Southside Foundry Co. being indebted to the appellee, Louis

Schneider, in the sum of $800, for money borrowed, executed a mortgage on the pig iron to secure such indebtedness. This mortgage was duly recorded in two days thereafter. On the 13th of August the Southside Foundry Co. made a general assignment under the laws of this State for the benefit of its creditors. Rogers, Brown & Co. subsequently paid to the railroad company $152.75 freight and $102 demurrage, in all $254.75, and took possession of the iron and removed it to the premises of their co-appellant, the Indianapolis Foundry Co., which had possession of it at the time this suit was instituted. The notes executed by the Southside Foundry Co. for the purchase-price of the iron have never been paid, nor has the Southside Foundry Co. ever paid therefor in cash. Nor did it ever pay the freight and demurrage. The appellee made a demand upon the appellants for the possession of the iron before this suit was instituted. All these facts are undisputed.

Thomas Markey, a member of the Southside Foundry Co., and a witness for appellee, testified as follows: "I went to see Mr. Perry, who is the agent of the (rail) road, and asked him to give me an order to throw the iron off. Perry gave me an order to throw the iron off and I took it down * * * to the yardmaster, and I gave the order to him, and we went up on the track and located the cars. 'Now,' he says, 'you can throw it off here or you can throw it off above, just as you like.' It was the handiest place to unload it—we can haul it out—and I told him to set it there and I could unload it. * * * * * * I went up to the office in the afternoon and sent four men down there to unload it, and afterwards, later on, I came by to see how they were getting along, and they were unloading it, and I remarked to them to keep it up close, because it was unloaded right between the drive-way and the track.

I told them to keep the iron up close.  I knew the iron was there.  I afterwards went there and saw it.  I used generally to go around.  *  *  *  *  *  *  I used to go by and see when the iron was thrown off (and) to see that they hauled it all away, and sometimes to see that none would take the iron out of the yards."

Ques.:  "What understanding or what agreement as to the payment of freight to the railroad company was there, if any?"

Ans.:  "There was none; no more than usual; we used to throw the iron off and would then send a check down."  *  *  *

Ques.:  "What, if any, agreement did you have with  *  *  Perry as to the railroad company hauling the iron?"

Ans.:  "I went down to see  *  *  Perry.  I asked him if I could throw that iron off for us; that he might hold it there until the freight was paid?  He said 'Yes, sir, we might,' and he gave me an order to the yardmaster to have it thrown off; that was the understanding."

Ques.:  "You may state  *  *  *  whether or not that had been your usual course of dealing with the railroad company—with this railroad company, at that time and place?"

Ans.:  "Yes, sir."

Mr. Perry, the freight agent of the railroad company, a witness for the appellants in his examination in chief concerning the unloading of the cars testified as follows :

"These cars with the freight on them were held by our company because the freight had not been paid; we declined to deliver it to the Southside Foundry unless the freight was paid; they not being able to pay the freight the cars remained in our yards this length of time, and we made several attempts to collect the freight,

Rogers *et al. v.* Schneider.

sending word to Mr. Markey by telephone, also by collector, and I think he finally came up; there were three cars in the yard; one other car besides these two. He paid the freight on one car to the cashier and came into my room and said that he had paid for one car, but was not yet able to pay for the others. I told him that the car service was running up on it very heavily and we needed the cars very badly and he ought to make some arrangement; that it would be cheaper for him to borrow the money than to pay us that heavy rate of interest, one dollar a day on each car, and we needed the cars very badly; and then he said he acknowledged that he had imposed upon us somewhat and said that he was willing to unload this material on the ground, furnishing his own men, in order to release these cars; that he was not able to pay these bills; that is the way I came to issue this order to the yardmaster to set these cars where they could be unloaded, and also saw the yardmaster in person and told him to be sure and set them some place where they would be under the eye of our watchman night and day. There was nothing said about carrying the freight for him or anything of that sort. * * * Nothing said about storing these until he could pay the freight; we had no conversation about the payment of the freight."

Ques.: "Was there any agreement of that kind, that you would hold it until he paid the freight?"

Ans.: "No, sir; just exactly the contrary. We were trying to get him to take his freight. * * * *"

Ques.: "What, if any, agreement was made between you and Mr. Markey about the possession of those goods?"

Ans.: "No agreement whatever; no agreement at all."

Ques.: "What agreement, if any, was made between you and Markey about holding those goods in storage for them?"

Ans.: "None whatever; no agreement."

Ques.: "State whether or not you gave them any permission to come and take the goods away?"

Ans.: "No, sir: on the contrary, I had very strict watch kept over them by watchmen day and night to see that they did not take them away."

Ques.: "Why were they unloaded?"

Ans.: "They were unloaded to release the cars and to stop the car service."

Ques.: "Was there any other purpose for their unloading?"

Ans.: "No, sir: not so far as we were concerned."

And on cross examination this witness testified as follows:

Ques.: "All the control you claimed was simply to get your freight, was it not?"

Ans.: "That is the carriage."

Ques.: "You just wanted your freight, that is all you wanted?"

Ans.: "Yes, sir."

Ques.: "And whatever you did you just took the necessary precautions to see that you didn't lose your lien for freight?"

Ans.: "Yes, sir."

Ques.: "And you could claim the goods as far as you were concerned as carrier for freight; that is all you were interested in?"

Ans.: "Yes, sir: I was interested for our company."

And on re-examination the witness testified as follows:

Ques.: "That you could do at any time before the notice to hold the goods?"

Ans.: "Yes, sir: We were doing that every day."

Ques.: "I will ask you whether or not you ever recently let this company take goods away from that yard without paying the freight?"

Ans.: "No, sir: I think not for two years past."

At the conclusion of the evidence the plaintiff moved the court to instruct the jury to return a verdict in his favor. This motion was sustained, and a general verdict returned in his favor on which judgment was subsequently rendered. This action of the court was one of the causes assigned for the new trial.

It is within the power and it is the duty of the court to direct the verdict in a proper case. If the controlling facts are all admitted, or are undisputed, and but one reasonable inference can be drawn, it is not error for the court to instruct the jury what the verdict should be. *Hall* v. *Durham*, 109 Ind. 434. Was this rule of practice properly applied in this case?

The right of a vendor of personal property to retake it before it comes into the actual possession of the vendee upon the vendee's insolvency or inability to pay therefor, is highly favored on account of its intrinsic justice. One man's goods ought not be taken to satisfy the debts of another. The vendor, if it be possible to do so without violating any principle of law, should have the prior right to make himself secure out of the property which gave rise to the debt due him, and to this end he may retake the goods at any time before the *transitus* ends.

A clear and unequivocal case of the termination of the transit should be made out by the evidence before the vendor should be deprived of this right. The transit does not necessarily end upon the arrival of the goods at the point of their destination, but continues so long as they remain in the possession and control of the carrier as such. It is true that the carrier may convert himself

into an agent for the vendee, or receive and store the goods as a warehouseman, and thus terminate the transit before the goods come into the actual possession of the vendee. This constitutes a constructive delivery to the vendee and the vendor's right of stoppage in transit is lost. 2 Benj. Sales, section 1117. *Whitehead* v. *Anderson*, 9 M. and W. *518; *Williams* v. *Hodges*, 18 S. E. Rep. 83. There are some cases which hold that when the carrier by arrangement or agreement with the vendee becomes his agent or warehouseman, the agreement, in order to terminate the *transitus*, must be supported by a consideration. *Farrell* v. *Richmond etc. R. R. Co.*, 9 S. E. Rep. 302; *Whitehead* v. *Anderson, supra.* On the other hand there are cases which hold that any arrangement made between the consignee and the carrier by which the carrier becomes an ordinary bailee for the goods, will end the *transitus.* We do not find it necessary to go to either of these extremes in this case. Whether or not the *transitus* had ended or in what capacity the railroad company held the iron, whether as carrier or as an ordinary bailee at the time the mortgage was executed, was a question of fact to be determined from all the evidence in the case and should have been submitted to the jury. If the evidence was conflicting upon these questions, or if it was undisputed and two reasonable inferences arise therefrom it was within the province of the jury to determine the conflict and to draw the inference, and these questions should not arbitrarily be taken from it. The evidence makes a strong impression upon our minds that the railroad company had not ceased to be a carrier in relation to the iron at the time the appellant exercised its right of stoppage *in transitu.* At all events, under the circumstances of this case, the appellant was entitled to go to the jury on that question. Nor does the fact that the appellant took the

notes of the Southside Foundry Co. for the purchase money of the iron deprive it of its right of stoppage *in transitu.*.   Benj. Sales, section 1144.

Judgment reversed, with instruction to sustain the motion for a new trial.

Filed June 13, 1895.