CENTENNIAL INSURANCE COMPANY v. HALEY TRANSFER AND STORAGE, INC.,

---

FEDERATED MUTUAL IMPLEMENT AND HARDWARE INSURANCE COMPANY v. HALEY TRANSFER AND STORAGE COMPANY, GREAT AMERICAN INSURANCE COMPANY, SECURITY INSURANCE COMPANY OF HARTFORD, CHEROKEE INSURANCE COMPANY AND GLOBE INDEMNITY COMPANY

No. 7318SC126

(Filed 23 May 1973)

1. Carriers § 10; Insurance § 78— goods in transit — shipper's insurance — insurer's right of subrogation

Even though a policy on goods in transit issued to the shipper provided that the insurance should not inure to the benefit of the carrier, the insurer did not waive its right of subrogation by payment of its obligation to the shipper.

---

Insurance Co. v. Transfer and Storage Co.

---

2. **Carriers § 10; Insurance § 78— goods in transit — shipper's insurance — insurer's subrogation right against carrier — benefit to carrier clause in bill of lading — qualifying clause in policy**

Insurance carried by the shipper on goods destroyed by fire in the carrier's warehouse did not inure to the benefit of the carrier and thus defeat the insurer's subrogation rights against the carrier by reason of a provision in the bill of lading that any carrier liable on account of loss or damage to property in its possession shall have the benefit of any insurance on the property "so far as this shall not avoid the policies or contracts of insurance" where the shipper's policy provided that it should not inure to the benefit of the carrier or it would be null and void.

3. **Carriers § 10; Insurance § 78— benefit of insurance to carrier clause in bill of lading — policy provision allowing acceptance of ordinary bills of lading — insurer's right of subrogation**

Although a bill of lading for goods in transit contained a benefit of insurance to carrier clause, the right of the shipper's insurer to subrogation against the carrier for loss of the goods was not barred by a provision of the policy granting the shipper the privilege of accepting ordinary bills of lading from the carrier but prohibiting the shipper from entering into any special agreement releasing the carrier from its common law or statutory liability.

4. **Carriers § 10— goods in warehouse not "stopped or held in transit" — liability of carrier for damage**

Goods destroyed by fire in the carrier's warehouse were not "stopped or held in transit" at the request of the shippers within the meaning of a bill of lading provision relieving the carrier of liability for damage to such goods except in cases of negligence by the carrier where the goods were being held by the carrier for consolidation with other goods and shipment to the purchaser and the shipper had not instructed the carrier to hold the goods and not deliver them because of insolvency of the purchaser or any other reason.

5. **Carriers § 10— freight forwarder — liability for goods destroyed by arsonist**

Defendant was acting in the capacity of a freight forwarder, not a warehouseman or freight consolidator, and thus had the liability of a carrier for goods destroyed by an arsonist's fire in its warehouse, where defendant's trucks pick up merchandise at the plants of shippers and take the merchandise to defendant's warehouse for consolidation with other goods and shipment to the consignees, defendant delivers the consolidated shipment to a rail carrier and signs the rail bill of lading, and defendant offers break-bulk and distributing services with respect to the consolidated shipments.

6. **Carriers § 10— bill of lading — contract as carrier, not warehouseman — liability for loss of goods**

Where defendant contracted as a carrier, not as a warehouseman or freight consolidator, in the bill of lading which it issued to a shipper, defendant is subject to the rule that a carrier is liable for

the loss of goods in transit in the absence of a special contract unless the carrier can show the loss was attributable to an act of God, the public enemy, the fault of the shipper, or inherent defect in the goods shipped.

APPEAL by Centennial Insurance Company and Federated Insurance Company from *Exum, Judge,* 11 September 1972 Session, Superior Court, GUILFORD County.

On and before 8 April 1968, Carolina Seating Company and its corporate affiliate, Selrite, Inc., and Dunton Hardware Company sustained a loss by reason of damage to goods being stored by Haley Transfer and Storage Company (hereinafter referred to as Haley). Haley's warehouse and the goods stored therein were destroyed by a fire set by an arsonist on 8 April 1968. Centennial Insurance Company (hereinafter referred to as Centennial) insured Carolina Seating Company and Selrite, Inc. under its manufacturer's transportation policy No. 235-010-494. Centennial paid its insured the entire reasonable value of its goods and brought suit as subrogee against Haley. Federated Mutual Implement and Hardware Insurance Company (hereinafter referred to as Federated) at the time of the loss, provided coverage to Dunton Hardware against risk of physical loss or damage to goods owned by it and in transit. It paid to Dunton the sum of $4,250, the value of the goods destroyed, and, as subrogee, brought suit against Haley including in its complaint an alternative claim against Haley's insurers, Great American Insurance Company, Security Insurance Company of Hartford, Cherokee Insurance Company, and Globe Indemnity Company. The claims against Haley's insurers are not involved in this appeal. The Federated case was consolidated with the Centennial case for trial. After hearing the evidence, the court entered findings of fact and conclusions of law. The court concluded in each case that Haley, "with regard to the goods in question, was not acting in the capacity of a common carrier, but was acting in the capacity of a warehouseman or 'freight consolidator'", and as a warehouseman or freight consolidator, was not liable for the destruction of the goods by an arsonist, there being no evidence of any negligence on the part of Haley. Additionally, the court held that plaintiffs should be denied recovery by virtue of the terms of the bill of lading, in that: (a) the terms relieved the carrier or party in possession while the goods were "stopped or held in transit," and the court concluded that the goods were "stopped or held in transit" at the time of the loss, and (b) [as to Centennial] the terms provided

that any carrier or party liable on account of loss or damage to goods shall have the full benefit of any insurance that may have been effected upon said goods unless allowing such benefit would avoid the policy or contract of insurance. Each plaintiff had paid its insured and did not seek to avoid its coverage.

Each appellant excepted to each conclusion of law as not being supported by the findings of fact. In addition, Federated excepted to a finding of fact as will appear in the opinion.

*Haworth, Riggs, Kuhn and Haworth, by John Haworth, for plaintiff appellant Centennial Insurance Company.*

*Craighill, Rendleman and Clarkson, P.A., by Hugh B. Campbell, Jr., for plaintiff appellant Federated Mutual Implement and Hardware Insurance Company.*

*Hudson, Petree, Stockton, Stockton and Robinson, by J. Robert Elster, and Schoch, Schoch, Schoch and Schoch, by Arch Schoch, for defendant appellee Haley Transfer and Storage, Inc.*

MORRIS, Judge.

Some of the findings of fact pertinent to this appeal are identical in both judgments. Since they do not occupy the same numerical position in both orders, we have renumbered them for the purposes of this opinion.

(1) "At all times pertinent hereto, the defendant Haley operated a business in High Point, North Carolina, whereby Haley received shipments of goods at its warehouse in High Point, North Carolina, from furniture manufacturers; consolidated shipments of various shippers to common destinations so as to obtain decreased freight charges by shipping in carload lots; and provided storage for such shipments while carload shipments were being assembled. After a sufficient quantity of goods going to the same general destination were assembled and consolidated, Haley would deliver such shipment to a common carrier for delivery to destination. Haley made a charge for such services which was billed to and paid by the shipper or consignee as agreed upon as to each shipment when it was accepted by Haley. Haley did not base its charges upon uniform published rates."

(2) "In addition to the services described in Finding of Fact No. [1], Haley operated a pickup service for shippers in High Point, North Carolina, whereby Haley maintained trucks and employed drivers to pick up merchandise at the plants of various shippers and to deliver such merchandise to Haley's High Point warehouse for consolidation and shipment. Haley made a separate charge for such pick-up service which was billed and paid by the shipper or consignee and which was agreed upon as to each shipment."

(3) "At all times pertinent hereto, Haley had neither applied for nor had been granted I.C.C. authority to operate either as a common carrier or a freight forwarder."

(4) (a) "With respect to said goods, the defendant Haley, through its employees, had upon receipt of the goods, signed a 'short-form bill of lading' which contained the following language: 'The property described below, in apparent good order, except as noted (contents and conditions of contents of packages unknown), marked consigned, and destined as indicated below, which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in Official, Southern, Western and Illinois Freight Classifications in effect on the date hereof, if this is a rail or a rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment.

Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.' "

(b) "The 'Official, Southern, Western and Illinois Freight Classification,' which is incorporated by reference into the bill of lading, contains the following pertinent provisions:

'Sec. 1 (a). The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided.

(b) No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, the authority of law, or, the act or default of the shipper or owner, or for natural shrinkage. The carrier's liability shall be that of warehouseman, only, for loss, damage, or delay caused by fire occurring after the expiration of the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided) after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination, or tender of delivery of the property to the party entitled to receive it, has been made. Except in case of negligence of the carrier or party in possession (and the burden to prove freedom from such negligence shall be on the carrier or party in possession), the carrier or party in possession shall not be liable for loss, damage, or delay occurring while the property is stopped and held in transit upon the request of the shipper, owner, or party entitled to make such request, or resulting from a defect or vice in the property, or for country damage to cotton, or from riots or strikes. . . .

Sec. 2 (c). Any carrier or party liable on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been effectuated upon or on account of said property, so far as this shall not avoid the policies or contracts of insurance: provided, that the carrier reimburse the claimant for the premium paid thereon.'

A copy of the 'Official, Southern, Western, and Illinois Freight Classifications' provisions as contained in the Uni-

form Domestic Straight Bill of Lading and incorporated by reference in the aforesaid short form bill of lading appears in evidence as Exhibit 40."

(5) The merchandise was destroyed by a fire which occurred on 8 April 1968, and which was set by an arsonist who was later convicted. The fire occurred without negligence on the part of Haley.

(6) "Once goods had been consolidated by Haley into carload lots and delivered to a common carrier, Haley had no further participation in the ultimate delivery of said goods. Haley did not participate in the distribution of said goods at destination." (To this finding of fact Federated excepted. Centennial did not.)

As to Centennial, the court found that the property was picked up at Carolina Seating Company's plant at High Point by Haley's truck and driver and delivered to Haley's warehouse for consolidation and shipment on or about the date stated, consigned to the party stated, and had been sold for the price stated in the complaint. Charges for shipment as to part of the merchandise were to be collected from the consignee. As to the rest of the merchandise, charges were to be prepaid by the shipper, Carolina Seating.

Also as to Centennial, the court found that the insurance policy issued by Centennial contained the following provisions:

"The insurance policy issued by the plaintiff contained, among other provisions, the following clauses:

'BENEFIT OF INSURANCE. Warranted by the assured that this insurance shall not inure directly or indirectly to the benefit of any carrier, bailee or other party, by stipulation in bill of lading or otherwise and any breach of this warranty shall render this policy of insurance null and void.'

'IMPAIRMENT OF CARRIER'S LIABILITY. Any act or agreement by the assured, prior or subsequent hereto, whereby any right of the assured to recover the full value of, or amount of damage to, any property or interest lost or damaged and insured hereunder, against any carrier, bailee or other party liable therefor, is released, impaired or lost, shall render this policy null

and void, but the insurer's right to retain or recover the premiums shall not be affected.'

An endorsement to said policy, designated as Form D, contained the following clause:

'7. Privilege is granted the assured to accept the ordinary bills of lading or receipts issued by the carrier, but it is agreed that the assured will not enter into any special agreement releasing the carrier from its common law or statutory liability.' "

The court further found that no claim was made against any consignee nor had any payment been received from any consignee by Carolina Seating Company and Selrite, Inc.

As to Federated, the court found that Dunton Hardware had stored in Haley's warehouse awaiting shipment to Arcadia, Kansas, certain pieces of furniture which Dunton had purchased from furniture manufacturers in the High Point area.

Centennial argues that under the stipulated facts, liability on Haley should be assessed as against a carrier under the bill of lading signed by Haley. Federated agrees with Centennial and, in addition, urges that Haley is a freight forwarder and, therefore, liable as a carrier. Haley argues that it is a freight consolidator and liable only as a warehouseman, that the bill of lading was only a receipt for the merchandise. Haley further argues that the terms of the bill of lading relieved it of liability as the party in possession, or even if it were held to be a carrier, while the goods were stopped in transit and the goods here were stopped in transit. Further, Haley says that the bill of lading terms provided that any carrier or party liable on account of loss or damage to goods shall have the full benefit of any insurance that may have been effected upon said goods unless allowing such benefit would avoid the policy or contract of insurance, and that, as to Centennial only, Haley gets the benefit of insurance and is relieved of liability.

[2] We will discuss the questions raised in inverse order. First, as to Centennial, is Haley relieved of liability, if any it has, by reason of the terms of the bill of lading with respect to any insurance effective on the goods destroyed while in its possession?

The "Official, Southern, Western and Illinois Freight Classification" was incorporated by reference into the bill of lading. The pertinent portion of that classification is § 2(c); "Any carrier or party liable on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been effectuated upon or on account of said property, so far as this shall not avoid the policies or contracts of insurance: provided, that the carrier reimburse the claimant for the premium paid thereon."

Centennial's policy contained a provision providing "that this insurance shall not inure directly or indirectly to the benefit of any carrier, bailee or other party, by stipulation in bill of lading or otherwise, and any breach of this warranty shall render this policy of insurance null and void." The policy also provided that if the insured did anything whereby its right to recover against the carrier was released, thus defeating insurer's right of subrogation, the policy would be null and void.

[1]  Centennial paid the insured the full coverage afforded by the policy. However, even though the policy provided the insurance should not inure to the benefit of the carrier, Centennial did not waive the right of subrogation by payment of its obligation to the shipper, its insured. *National Garment Co. v. New York, C. & St. L.R.Co.*, 173 F. 2d 32 (8th Cir. 1949).

The struggle to solve the question of who shall bear the loss of insured goods in transit has been a protracted one with shipper, carrier, and insured engaged in a three-way struggle, each trying to shift the loss.

In *Richard D. Brew & Company, Inc. v. Auclair Transportation, Inc.*, 106 N.H. 370, 372-373, 211 A. 2d 897 (1965), the New Hampshire Supreme Court quoted with approval the following from Patterson, Essentials of Insurance Law (2d ed. 1957):

"In the beginning, the insurer of goods in transit was, on paying the insured, subrogated to the insured's claim, as shipper, against the carrier. Then the carrier inserted a stipulation in the bill of lading requiring the shipper to give it the benefit of any insurance that he might have, and this clause was held to cut off the insurer's right of subrogation even though the loss was due to the carrier's negligence. [*Phoenix Ins. Co. v. Erie & Western Transp. Co.*,

117 U.S. 312 [6 S.Ct. 750, 29 L.Ed. 873] (1886)]. This decision, which caused all the trouble, was an erroneous application of the perfectly sound principle that the insurer is subrogated only to the extent of the insured's claim against the third party. The carrier did not and could not by stipulation extinguish his liability to the shipper; and if the idea of subrogation is sound, the loss should ultimately fall upon the person who had the greater measure of control over it. However, the decision stood, and the insurers countered by inserting a condition, in policies on goods in transit, that the policy should be void if the insured should contract with the carrier that the latter should have the benefit of the insurance. The carrier has not been successful in counteracting the effect of these stipulations; and under most recent decisions, the ultimate loss falls upon the carrier."

One of the earlier cases in this field was *Adams v. Hartford Fire Ins. Co.,* 193 Iowa 1027, 188 N.W. 823 (1922). In that case the insurance to the shipper was made void by any act defeating subrogation, and the bill of lading contained the usual benefit of insurance to carrier clause plus a new qualifying clause "so far as this shall not avoid the policies or contracts of insurance." The shipper sued the insurance company to recover for loss and damage to the shipment while in transit. The Court held that the qualifying clause excepted this insurance policy from the benefit clause of the bill of lading, that subrogation had not been defeated, and the shipper could recover against the carrier.

The Court in *National Garment Co. v. New York, C. & St. L.R.Co., supra,* discussed the Adams case and followed it. In its opinion, the Court said:

"The doctrine of subrogation was adopted by equity to put the burden of loss on the one primarily responsible for it. This right of subrogation arises out of the nature of the contract of insurance as a contract of indemnity, the carrier being primarily and the insurer secondarily liable. The insurer's right of subrogation exists as a matter of equity, and is not dependent upon the reservation of the right in the contract of insurance. But, since it is derived from the shipper, it may be defeated by an unqualified provision in the shipping contract giving the carrier the benefit of any insurance effected on a shipment by the owner. (Citations

omitted.) The carrier, however, may not require a shipper to carry insurance for the carrier's benefit. Such a provision in the bill of lading is void. (Citation omitted.) The insurer, since its obligation under a policy of insurance is wholly contractual, has the right to impose such conditions upon its liability as it sees fit to incorporate in its agreement with the shipper. The insurer and the shipper may make a valid contract of insurance, protecting the insured against loss, preserving the insurer's right of subrogation against the carrier upon the payment of the loss, and worthless to the carrier. And that is what occurred in the present case. Since the insurance company was liable to the shipper on its policy of insurance, its recognition of that liability by payment of the shipper's claim was neither voluntary nor unconditional. It had no defense at law to the shipper's claim, and it did not waive its right of subrogation by paying an obligation which the law required it to pay."

[2] Other cases holding that the carrier was not entitled to the benefit of the insurance where the bill of lading gave the carrier the benefit of insurance upon the goods "so far as this shall not avoid the policies or contracts of insurance," and the policy of insurance issued to the shipper provided that it should not inure to the benefit of the carrier, are: *Graysonia, N. & A. R. Co. v. Newberger Cotton Co.*, 170 Ark. 1039, 282 S.W. 975 (1926) ; *Dejean v. Louisiana Western R. Co.*, 167 La. 111, 118 So. 822 (1928) ; *Staple Cotton Co-op. Asso. v. Yazoo & M.V.R. Co.*, 189 Miss. 387, 197 So. 828 (1940) ; *Towmotor Co. v. Frank Cross Trucking Co.*, 205 Pa. Super. 448, 211 A. 2d 38 (1965). We think the cases so holding are well reasoned and reach a logical result.

[3] Defendant, however, says that even so, an endorsement to Centennial's policy bars its claim. The endorsement provides:

"7. Privilege is granted the assured to accept the ordinary bills of lading or receipts issued by the carrier, but it is agreed that the assured will not enter into any special agreement releasing the carrier from its common law or statutory liability."

We do not think that the endorsement is inconsistent with the plain intent of the insurer. A similar provision was before the Court in *Maxwell Textile Co. v. Globe & R. Fire Ins. Co.*, 132 Misc. 679, 230 N.Y.S. 340 (1928), aff'd 225 App. Div. 279,

232 N.Y.S. 586 (1929), aff'd per curiam 251 N.Y. 535, 168 N.E. 417 (1929). In holding the provision ineffective to bar insurer's rights, the Court said:

> "When the policy is read as a whole, it is evident the defendant was attempting to preserve to the fullest extent its right of subrogation against the carrier and to guard itself against any special agreement on the part of the assured, whereby its right of action against the carrier might be released, impaired, or lost. The contract must be construed so as to make of it a harmonious whole. To this end the specific prohibition against destroying or impairing the defendant's right of subrogation must be deemed an exception to words of general permission to accept ordinary bills of lading." 225 App. Div. at pp. 281-282.

We hold that neither the benefit provision in the bill of lading nor the above-quoted endorsement to Centennial's policy bars Centennial's claim.

[4]  Both plaintiffs urge that the trial court erred in concluding that even if defendant is liable as a common carrier, defendant was entitled to judgment because the goods were "stopped or held in transit" at request of the shippers.

The "Official, Southern, Western and Illinois Freight Classification," incorporated by reference into the bill of lading, contained the following provision:

> "§ 1.(b) . . . Except in cases of negligence of the carrier or party in possession (and the burden to prove freedom from such negligence shall be on the carrier or party in possession), the carrier or party in possession shall not be liable for loss, damage, or delay occurring *while the property is stopped and held in transit upon the request of the shipper, owner, or party entitled to make such request* or resulting from a defect or vice in the property, or for country damages to cotton, or from riots or strikes . . ." (Emphasis supplied.)

If the goods were stopped in transit by the shipper, then Haley would be liable only for its negligence, and it is stipulated that the loss was occasioned by an arsonist and not by reason of any negligence on the part of Haley. "The right of stoppage in transitu is a right which a seller of goods on credit has to recall them or retake them while they are in the possession of

a carrier or other middleman who received them for delivery to the buyer, on the discovery of the insolvency of the buyer." 46 Am. Jur., Sales, § 526, p. 682. It is an equitable right first recognized in an early English case, *Wiseman v. Vandeputt,* 2 Vern. 203, 23 Eng. Reprint 732, and recognized as a common law right by the courts of this country and by the courts of this State. In *Farrell v. R.R.,* 102 N.C. 390, 9 S.E. 302 (1889), the Court recognized the right and said:

> "The plaintiff's right is based upon this alleged right to stop the property *in transitu.* This right 'arises solely upon the insolvency of the buyer, and is based upon the plain reason of justice and equity, that one man's goods shall not be applied to the payment of another man's debts. If, therefore, after the vendor has delivered the goods out of his own possession, and put them in the hands of a carrier for delivery to the buyer (which, as we have seen . . . is such a constructive delivery as divests the vendor's lien), he discovers that the buyer is insolvent, he may retake the goods if he can, before they reach the buyer's possession, and thus avoid having his property applied to paying debts due by the buyer to other people.' . . . It is 'highly favored on account of its intrinsic justice.' Benjamin on Sales, 2 Vol., secs. 1229-1231." Farrell, at pp. 399-400.

The court found as a fact and the parties stipulated that "[t]he defendant's driver who received the merchandise delivered it to Haley's warehouse in High Point, North Carolina, where it was being *held by Haley for consolidation and shipment by rail carrier."* (Emphasis supplied.) Nothing in the record indicates that the shipper had instructed Haley to hold the goods and not deliver them to the consignee because of insolvency of the consignee or any other reason. The goods were being held by Haley for consolidation and shipment to the purchaser. There is nothing in the facts found by the court which would support the court's conclusion of law that the goods were stopped in transit upon request of the shipper at the time of the loss. This conclusion was error.

[5] Plaintiff Federated also contends that the court erred in concluding that Haley was acting in the capacity of a warehouseman or "freight consolidator." Plaintiff takes the position that the undisputed facts and the facts found by the court categorize defendant as a freight forwarder, thus placing upon it the liability of a carrier. We agree.

"The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8, or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title." Part IV of the Interstate Commerce Act, 49 U.S.C.A., § 1002(a) (5).

Defendant contends that this section has no application because § 1002(c) specifically excludes the defendant's operations in providing that the provisions of the chapter, including the definition of freight forwarder, do not apply "to the operations of a warehouseman or other shippers' agent, in consolidating or distributing pool cars, whose services and responsibilities to shippers in connection with such operations are confined to the terminal area in which such operations are performed." We think it obvious from the facts of this case that defendant does not come within the exclusion.

Defendant further urges that it is not a freight forwarder because it does not perform or provide for "the performance of break-bulk and distributing operations with respect to such consolidated shipments." The court found that defendant did not participate in the ultimate delivery of the goods or "participate in the distribution of said goods at destination." There is no evidence that defendant actually participated in the ultimate delivery or distribution. There is evidence, however, that the services were offered by Haley. In Dunton Hardware's answers to interrogatories posed by Federated, Dunton, through its officer, said that, "Haley would pick up the furniture from the manufacturer's call that the furniture was ready to go out. Haley would then take the furniture to its warehouse there in High Point and hold it until it could consolidate a full carload shipment. It would then forward the carload shipment on to

Kansas City, Missouri, to its distributor there. The distributor would break down the car and forward our merchandise. Or, if enough weight, would stop the car at Arcadia for part unloading." Dunton specified "Haley" as its complete shipping directions. The president of defendant testified that they would hold Dunton's merchandise until they had enough to warrant making a stop car for Dunton. Then they would load the merchandise in a Kansas City car with Dunton merchandise near the doorway. The car would be stopped for partial unloading by Dunton. The final destination for the car was Kansas City. There were two consignees. Dunton Hardware and the distribution agent in Kansas City. The president also testified that the Interstate Commerce Commission had determined that Haley had chosen its distributors and, therefore, was acting as a freight forwarder without a certificate.

The federal courts have held that in order to qualify as a freight forwarder it is not necessary that all the functions authorized by § 1002, supra, be performed, so long as a party proffers all of the services described. *Metropolitan Shipping Agents of Illinois, Inc. v. United States*, 342 F. Supp. 1266 (D.N.J. 1972) ; *National Motor Freight Traffic Association v. United States*, 205 F. Supp. 592, (D.D.C. 1962), aff'd 371 U.S. 223, 83 S.Ct. 311, 9 L.Ed. 2d 273 (1962), reh. denied and opinion clarified 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed. 2d 709 (1963). In its discussion of Haley's operations in a cease and desist order dated 17 December 1971 [Investigations of Operations, 340 ICC 350 (1971)], the Commission stated Haley's operations as:

"Haley's operation resembles, and is employed by shippers as, an economical substitute for freight forwarding in the sense that the latter may anticipate that upon tender to respondent their traffic will move to destination without further effort or intervention on their part. Upon call, Haley will dispatch a local carrier to pick up the shipments and transport them to its dock, will obtain the railcar, and sign the rail bill of lading, and consign the carload to a 'distributor' at one of the cities it serves. Break bulk, distribution, and collection of the freight charges are performed by the latter according to the instructions entered on the manifest accompanying the carload." 340 I.C.C., at p. 351.

The Commission further stated that if the nature of the operations of the company was understood by the public it served as rendition of a complete transportation service, then the Commission would not hesitate to disregard the absence of formal relationships with other participants in the process. The stipulated facts, read carefully, certainly leave no doubt but that the shippers expected complete transportation when they shipped via Haley. It seems obvious to us that Haley held itself out to the public as more than a warehouseman or freight consolidator. It appears that to obtain complete service to destination, a shipper had only to tender goods to Haley with a document indicating the consignee. To the shipping public, Haley's undertaking constituted the essence of freight forwarding. It proclaimed to the shipper that the goods would move to its destination at volume rates without further effort on the part of the shipper. We are of the opinion that the court erred in concluding that defendant is a warehouseman or freight consolidator and not a freight forwarder.

[6]   Finally, we are of the opinion that Haley is liable under its bill of lading. It takes the position that the bill of lading was only a receipt for the goods. A bill of lading is also a contract to transport and deliver the goods as therein stipulated. *Griggs v. York-Shipley, Inc.,* 229 N.C. 572, 50 S.E. 2d 914 (1948). The fact that the bill of lading also constituted a contract is evidenced by its terms:

"The property described below, in apparent good order, except as noted (contents and conditions of contents of packages unknown), marked consigned, and destined as indicated below, which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property overall or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in Official, Southern, Western and Illinois Freight Classifications in effect on the date

hereof, if this is a rail or a rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment.

Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those on the back thereof set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns."

Haley contracted as a carrier and is subject to the well-known rule that a carrier is liable for the loss of goods in transit, in the absence of a special contract, unless the carrier can show the loss was attributable to an act of God, the public enemy, the fault of the shipper, or inherent defect in the goods shipped. *Cigar Co. v. Garner,* 229 N.C. 173, 47 S.E. 2d 854 (1948), as to intrastate shipments. *Missouri P. R. Co. v. Elmore & Stahl,* 377 U.S. 134, 12 L.Ed. 2d 194, 84 S.Ct. 1142 (1964), reh. denied 377 U.S. 984, 12 L.Ed. 2d 752, 84 S.Ct. 1880 (1964), as to interstate shipments [attempt to circumvent common law liability by contract is, by statute, not allowed]. If for no other reason, Haley is liable as a carrier under its own bill of lading.

For the reasons stated, the trial court's judgments must be reversed as to each conclusion of law and judgments entered in accordance with this opinion.

Judges CAMPBELL and HEDRICK concur.