ESTATE OF James H. WATERS, Jr., Deceased; William Roger Waters and John B. McMillan, Co–Executors, Petitioners–Appellants,

v.

COMMISSIONER OF the INTERNAL REVENUE SERVICE, Respondent–Appellee.

No. 94–1731.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1994.

Decided March 6, 1995.

**ARGUED**: John Craig Dorsey, Manning, Fulton & Skinner, Raleigh, NC, for appellants. Sara S. Holderness, Tax Division, U.S. Dept. of Justice, Washington, DC, for appellee. **ON BRIEF**: Loretta C. Argrett, Asst. Atty. Gen., Gary R. Allen, Jonathan S. Cohen, Tax Div., U.S. Dept. of Justice, Washington, DC, for appellee.

Before RUSSELL and WILLIAMS, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

Affirmed in part, reversed in part, and remanded by published opinion. Judge WILLIAMS wrote the opinion, in which Judge DONALD RUSSELL and Senior Judge CHAPMAN joined.

## OPINION

WILLIAMS, Circuit Judge:

This appeal concerns the interplay between state divorce law and federal estate tax law. In particular, we study the significant effect of supplanting common law marital rights with deferred community property principles on federal estate tax liability.

The Estate of James H. Waters, Jr. (Estate), acting by and through its co-executors, William Roger Waters and John B. McMillan, appeals the opinion and final judgment of the United States Tax Court in favor of the Commissioner. Mr. Waters (Decedent), a lifelong resident and domiciliary of North Carolina, died testate on July 3, 1988, from a subarachnoid hemorrhage. At the time of his death, Decedent was forty-eight years old and had been unmarried since August 1, 1984, when he and his former wife, Barbara S. Waters ("Ms. Waters"), divorced. The Estate filed a federal estate tax return (Form 706) on October 3, 1989, showing a gross estate of $5,681,720.15, a taxable estate of $4,521,345.34, and a tax liability of $1,596,-749.26. In a statutory notice of deficiency, the Commissioner determined a gross defi-

ciency in Decedent's federal estate tax in the amount of $399,519. The Estate petitioned the Tax Court for a redetermination of the deficiency.

Following the submission of joint stipulations of fact and a trial held on October 5, 1993, the Tax Court entered a decision for the Commissioner, finding an estate tax deficiency in the amount of $399,519. Specifically, the Tax Court found that Decedent's obligations enumerated in a "Support and Property Settlement" agreement executed by Decedent and Ms. Waters were not supported by adequate and full consideration pursuant to I.R.C. §§ 2043(b) & 2053(c)(1) (1988) and, thus, were not deductible from Decedent's gross estate pursuant to I.R.C. § 2053(a). The Tax Court further found that Decedent received no consideration for the transfer of a life insurance policy to Ms. Waters and, therefore, the proceeds of that policy were fully includable in Decedent's gross estate under I.R.C. § 2035(a) (1988). For the reasons discussed below, we reverse in part, affirm in part, and remand to the Tax Court for further proceedings in accordance with this opinion.

### I.

Decedent married Ms. Waters on November 23, 1961. They had two children, Jeanette Leigh Waters, born in 1966, and James H. Waters, III, born in 1969. At the time of their marriage, Decedent and Ms. Waters had no net worth, and substantially all the assets acquired during their marriage came from income Decedent earned through employment, business, and investment activities. Decedent was an officer of Boddie–Noell Enterprises, Inc. (Boddie–Noell) of Rocky Mount, North Carolina, and participated in Boddie–Noell's savings and retirement plan, as well as its deferred compensation plan. Decedent also held a minority share of Boddie–Noell stock.

Decedent and Ms. Waters separated on April 1, 1981, and thereafter lived apart from one another. In November of 1983, Ms. Waters brought an action against Decedent in the North Carolina General Court of Justice (State Court) seeking a divorce from bed

and board.[1] In January of 1984, Decedent filed an answer and counterclaim seeking an absolute divorce on the statutory ground of one year's separation. Both Ms. Waters in her action for divorce and Decedent in his counterclaim requested the State Court to determine their "marital property" and to make an equitable distribution of that property pursuant to the North Carolina equitable distribution statute, N.C. Gen.Stat. § 50–20 (1987). On August 1, 1984, the State Court dissolved the marriage by a decree of absolute divorce. The divorce decree did not resolve the issues of permanent alimony, child support, attorney's fees, and equitable distribution of property; instead, the State Court retained jurisdiction over these issues for further action.

From August 1983 through April 1987, Decedent and Ms. Waters, through their respective attorneys, periodically engaged in settlement negotiations relating to alimony, child support, and the division of their property. In 1986, however, Ms. Waters became concerned about how she would support herself and her children if Decedent were to die before they finalized their support and property agreement. At Ms. Waters's request, Decedent, on April 3, 1986, transferred to her a $200,000.00 life insurance policy issued to Decedent in 1983 by Southwest Life Insurance Company (Southwest). Ms. Waters did not give Decedent, or relinquish her entitle-

ment to, any property or money in return for this life insurance policy.

Finally, on April 28, 1987, Decedent and Ms. Waters executed an agreement, entitled "Support and Property Settlement" (Agreement), in the presence of a notary public for Wake County, North Carolina. By its terms, Decedent agreed to the following: (1) the assignment to Ms. Waters of $125,000.00 of Decedent's $250,000.00 deferred compensation plan; (2) the assignment to Ms. Waters of $12,869.13 of Decedent's $206,345.00 savings and retirement plan account; (3) the issuance of a promissory note in the amount of $220,000.00 to Ms. Waters; (4) the maintenance of $270,000.00 in life insurance, naming as beneficiary a trust for the benefit of Ms. Waters; (5) the payment of the children's college expenses; and, (6) the payment of the children's medical insurance expenses. The Tax Court found, and the parties do not contest, that the negotiations culminating in the Agreement between Decedent and Ms. Waters were adversarial in nature, and the resulting settlement constituted a bona fide arm's length transaction. Decedent's obligations as specified in the Agreement were carried out following his death in July of 1988.[2]

The Estate timely filed its federal income tax return on October 3, 1989. The return included $125,000 in the gross estate as the value of Decedent's interest in his deferred compensation plan and $191,794 as the value

---

1. The grounds for divorce from bed and board are set forth at N.C. Gen.Stat. § 50–7 and include: abandonment, malicious eviction, cruel or barbarous treatment that endangers the life of the other spouse, indignities to the person of the other spouse, excessive alcohol or drug use, and adultery. N.C. Gen.Stat. § 50–7(1)—50–7(6) (1987 & Supp.1993).

2. On April 28, 1987, immediately after entering into the Agreement, Decedent and Ms. Waters executed two documents entitled "Consent Qualified Domestic Relation Orders." One related to the payment to be made to Ms. Waters from Decedent's deferred compensation plan as described in Section 12.E(1) of the Agreement, and the other related to the payments to be made to Ms. Waters from his savings and retirement plan as described in Section 12.E(2) of the Agreement. These documents, although not attested to, were signed by Decedent, Ms. Waters, and an officer of Boddie–Noell, and then were forwarded, in May of 1987, to the State Court judge presiding

over the divorce case. Although the State Court judge signed these documents, neither of the documents was filed with the clerk of the court of the Nash County District Court, the court maintaining jurisdiction over the divorce case, or ever incorporated into the record of the divorce action.

In October of 1988, pursuant to Section 12.-C(2) of the Agreement, Decedent's estate paid to Ms. Waters $10,000 with respect to the $220,000 promissory note, and paid the remaining $210,-000 on March 14, 1989. Pursuant to Sections 12.E(1) and (2) of the Agreement, Decedent's employer, Boddie–Noell, paid to Ms. Waters $125,000 of Decedent's deferred compensation plan benefits and $12,869.13 of Decedent's savings and retirement plan benefits. Pursuant to Section 10 of the Agreement, the $270,000 in insurance proceeds were paid into a trust established for the benefit of Ms. Waters. In October of 1988, the trust paid Ms. Waters $16,000. As of September 30, 1993, the trust had paid Ms. Waters a total of $252,000.

of Decedent's savings and retirement plan.[3] These values only included the amounts paid to the Estate; they did not include the amounts paid to Ms. Waters. With respect to Decedent's remaining obligations under the Agreement, the return deducted as claims against the Estate: (1) $270,000 representing the proceeds of Decedent's Aetna life insurance policy paid to the trust for the benefit of Ms. Waters; (2) $17,656 representing the estimated college expenses of Decedent's son;[4] (3) $5,349 representing the estimated health insurance expenses of Decedent's son; and, (4) $220,000 representing the amount Decedent owed to Ms. Waters on the promissory note. The return also did not include any amount in Decedent's gross estate with respect to the life insurance policy transferred to Ms. Waters during the settlement negotiations in 1986.

In a statutory notice of deficiency, the Commissioner disallowed the deductions claimed with respect to Decedent's obligations under the Agreement on the ground that they were not supported by adequate and full consideration in money or money's worth as required by I.R.C. § 2053(c)(1).[5] The Commissioner also determined that, in accordance with I.R.C. § 2035(a), the proceeds from the life insurance policy transferred to Ms. Waters in 1986 were fully includable in the Decedent's gross estate. As a result of these adjustments, the Commissioner determined a gross deficiency in Decedent's federal estate tax in the amount of $399,519.

The Estate petitioned the Tax Court for a redetermination of the deficiency. However, in an opinion filed on April 28, 1994, the Tax Court agreed with the Commissioner and determined that because Decedent and Ms. Waters failed to effectuate an equitable distribution pursuant to North Carolina law, N.C. Gen.Stat. § 50-20, they necessarily relied on "traditional common law rules of property law" as consideration for the Agreement.[6] In support of this conclusion, the court reasoned that although Decedent and Ms. Waters initially invoked the North Carolina statutory provisions for equitable distribution, such distribution was never effectuated by the divorce court but was waived by Decedent and Ms. Waters. Thus, because the rights at issue in the Agreement were mere marital rights as described in I.R.C. § 2043(b), rather than vested property rights, the court concluded that the Agreement failed for lack of consideration. Furthermore, because the Tax Court recognized no right to equitable distribution, it failed properly to determine the character of this statutory prerogative under I.R.C. § 2043(b) and the consequent value of deductions from the gross estate in accordance with I.R.C. § 2053. We disagree with the Tax Court's understanding of the Agreement under North Carolina law and its concomitant determination of the Estate's tax liability in accordance with federal tax law. As to the Southwest life insurance policy, the Tax Court agreed with the Commissioner, holding that the proceeds of the policy were includable in the Estate under § 2035(a). We agree with the reasoning of the Tax Court as applied to the insurance policy.

## II.

We review decisions of the United States Tax Court on the same basis as decisions in civil bench trials in United States district courts. *Commissioner v. Duberstein*, 363 U.S. 278, 290–91, 80 S.Ct. 1190,

---

**3.** As to Decedent's savings and retirement plan benefits, Boddie–Noell actually paid the Estate $193,475.87, rather than $191,794, the amount reported on the estate tax return. The Estate conceded prior to trial that $1,681.87, the difference between the two amounts, was includable in Decedent's gross estate.

**4.** At the time of decedent's death, decedent's daughter had graduated from college.

**5.** In its tax return, the Estate excluded $125,000 of Decedent's deferred compensation plan and $12,869.13 of Decedent's Savings Plan Account,

both amounts paid directly to Ms. Waters. The Commissioner asserted, and the Tax Court found, that the Estate should have included these amounts in the return and and that furthermore they were not deductible. On appeal, the Estate concedes that these amounts should have been included in the gross estate but maintains that they are deductible.

**6.** By judgment entered May 3, 1994, the Tax Court assessed a deficiency in estate tax in the amount of $399,519.

1199–1200, 4 L.Ed.2d 1218 (1960). Although factual findings are reviewed under the clearly erroneous standard, *id.*, mixed questions of law and fact that require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles are reviewed *de novo. Mayors v. Commissioner*, 785 F.2d 757, 759 (9th Cir. 1986); *United States v. McConney*, 728 F.2d 1195, 1199–1204 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). This standard applies with particular force when the Tax Court interprets state law and draws conclusions as to federal tax liability based on its characterization of state legal principles. *Metzger v. Commissioner*, 38 F.3d 118, 120 (4th Cir. 1994) (reviewing *de novo* Tax Court's application of Maryland law).

This appeal involves two transactions: (1) The transfer of property to Ms. Waters in satisfaction of Decedent's obligations specified in the Agreement; and (2) the *inter vivos* transfer by Decedent of a $200,000 life insurance policy to Ms. Waters. We consider each transaction in turn.

### A.

Turning first to the transfer of property in satisfaction of Decedent's obligations under the Agreement, in order to determine the character of this transaction, we ascertain the nature of the property interests at stake in the Agreement under the law of North Carolina, Decedent's domicile. *Poe v. Seaborn*, 282 U.S. 101, 109–10, 51 S.Ct. 58, 58–59, 75 L.Ed. 239 (1970). We then look to federal law to determine how the transaction shall be taxed. *Morgan v. Commissioner*, 309 U.S. 78, 80–81, 60 S.Ct. 424, 425–26, 84 L.Ed. 585 (1940).

### 1.

The first issue we face is whether North Carolina common law rules of property or North Carolina's equitable distribution statute, N.C. Gen.Stat. § 50–20, governs our analysis of the transfer of property in satisfaction of Decedent's obligations under the Agreement. The Tax Court, relying on three alternative analyses, held that North Carolina common law rules govern this transaction. We disagree and address each analysis in turn.

### a.

Chapter 50 of the North Carolina General Statutes, entitled "Distribution by court of marital property upon divorce," is a comprehensive scheme designed to effectuate the fair distribution of property upon dissolution of marriage. N.C. Gen.Stat. § 50–20.[7] In enacting its provisions, the legislature transformed North Carolina into a "deferred community property law system." *Johnson v. Johnson*, 317 N.C. 437, 346 S.E.2d 430, 433 (1986) (citations omitted). Consequently, although common law principles (codified in Chapter 52 of the North Carolina General Statutes) apply during marriage, upon divorce the statute mandates distribution of the marital property according to community property principles as codified in Chapter 50 of the North Carolina General Statutes. N.C. Gen.Stat. § 50–20(c); *Johnson*, 346 S.E.2d at 433. Furthermore, under the North Carolina deferred community property system pursuant to which a distribution is effectuated at or following divorce, the nonacquiring spouse has a vested, present ownership interest in one-half of the marital property. *Id.* at 433–34. Thus, pursuant to North Carolina's equitable distribution scheme, the fact that legal title to property acquired during marriage is in one or the other spouse, or in both, does not control. *Id.*[8]

---

**7.** *See generally* Sally Burnett Sharp, *Equitable Distribution of Property in North Carolina: A Preliminary Analysis*, 61 N.C.L.Rev. 247, 248 (1983) (In the interest of effectuating "those sharing principles that motivate most couples during marriage ... [the statute] invests nontitled spouses with rights to property."); William E. Schwartz, *Survey of Developments in North Carolina and the Fourth Circuit: 1993 VII. Family Law—Equitable Distribution—Brown v. Brown*,

112 N.C.App. 15, 434 S.E.2d 873 (1993), 72 N.C.L.Rev. 1801 (1993) ("[E]quitable distribution seeks to effect upon divorce those sharing principles that motivate most couples during marriage.").

**8.** In their briefs before this court, the parties expend much effort debating the character of the respective rights of Decedent and Ms. Waters

The record reflects the exclusively marital character of the property at issue as defined in N.C. Gen.Stat. § 50–20(b)(1) which provides in pertinent part:

**§ 50–20. Distribution by court of marital property upon divorce.**

(a) Upon application of a party, the court shall determine what is the marital property and shall provide for an equitable distribution of the marital property between the parties in accordance with the provisions of this section.

(b) For purposes of this section:

(1) "Marital property" means all real and personal property acquired by either spouse or both spouses during the course of the marriage and before the date of the separation of the parties, and presently owned, except property determined to be separate property in accordance with subdivision (2) of this section. Marital property includes all vested pension, retirement and other deferred compensation rights....

N.C. Gen.Stat. § 50–20(a)–(b)(1). Indeed, it is undisputed that at the time of Decedent's marriage to Ms. Waters, neither had any net worth and substantially all the assets acquired during their marriage came from income earned by Decedent through his employment and his business and investment activities. Thus, by necessity, all of the property at issue in the Agreement was marital property described by § 50–20(b) and, consequently, subject to equitable distribution under § 50–20(a).

Notwithstanding the above statutory language, the Tax Court held that the Agreement was governed by traditional common law rules of property law "as modified by North Carolina statute, e.g., GS secs. [sic]

52–1, 52–4 (1991)." (J.A. 303.) We reject the Tax Court's reasoning based on our textual analysis not only of Chapter 50 but also based on a review of Chapter 52. Chapter 52 of the North Carolina General Statutes, as its title "Powers and Liabilities of Married Persons" suggests, defines the property rights and concomitant powers and liabilities of married persons, not divorced persons. At the time they executed the Agreement, Decedent and Ms. Waters had been divorced for over two years and, thus, were not governed by the provisions of Chapter 52. Furthermore, the Supreme Court of North Carolina has unequivocally held that the equitable distribution statute as codified in Chapter 50 and the married persons statute as codified in Chapter 52 "govern entirely different situations and were enacted for entirely different purposes." *Johnson*, 346 S.E.2d at 432. Otherwise stated, "§ 52–4 governs legal interests in ... property *during* an ongoing marriage, while § 50–20 governs its disposition *after* divorce." *Id.* at 434 (emphasis in original). Thus, whereas community property principles as codified in the equitable distribution statute do not apply to married couples and may only be effectuated pursuant to or following a decree of absolute divorce, community property principles do apply to divorced couples to the exclusion of the common law rules codified in Chapter 52. *Id.* at 433–34. We, therefore, conclude that the Tax Court erred in its application of common law property principles rather than the deferred community property scheme set forth in the North Carolina equitable distribution statute.

b.

The Tax Court, however, employed an alternative basis to find the North Carolina

---

upon filing of the divorce action under N.C. Gen.Stat. § 50–20(k):

    (k) The rights of the parties to an equitable distribution of marital property are a species of common ownership, the rights of the respective parties vesting at the time of the filing of the divorce action.

N.C. Gen.Stat. § 50–20(k) (1983). This right to seek equitable distribution, of course, does not elevate Ms. Waters's marital rights beyond a mere inchoate interest at the moment of filing for divorce. We rely rather on the interpretation of Chapters 50 and 52 by the Supreme Court of

North Carolina in *Johnson v. Johnson*, 317 N.C. 437, 346 S.E.2d 430 (1986), in which the court recognized that, consistent with deferred community property principles, the decree of divorce is the legally significant event which converts marital property interests into community property subject to equitable distribution. *Id.* 346 S.E.2d at 432–34. Of course, we need not resolve this debate because the issue is not before us, given that the Agreement was executed after the divorce. Thus, we deal only with community property interests extant following divorce.

equitable distribution scheme inapplicable in this case. According to the Tax Court, "for the regime of equitable distribution to apply, a party to the divorce action must apply to the court for it, . . . and the court, having made written findings to support equitable distribution must then itself make the equitable distribution." (J.A. 301.) Once again, we disagree with the Tax Court, concluding that its reasoning places procedural hurdles in the face of couples seeking to divide property where the clear language of the statute does not. Indeed, the equitable distribution statute specifically provides for the distribution of marital property by written agreement without the intervention of the court:

> (d) Before, during or *after marriage the parties may by written agreement . . . provide for distribution of the marital property in a manner deemed by the parties to be equitable* and the agreement shall be binding on the parties.

N.C. Gen.Stat. § 50–20(d) (emphasis added). Such agreements are favored in the State of North Carolina, "as they serve the salutary purpose of enabling marital partners to come to a mutually acceptable settlement of their financial affairs." *Hagler v. Hagler*, 319 N:C. 287, 354 S.E.2d 228, 232 (1987).[9] Thus, a valid support and property settlement will be honored by the courts and will be binding on the parties. *Id.* Decedent and Ms. Waters effectuated the distribution of their property in accordance with the third option contemplated in § 50–20(d), "by written agreement," "after marriage." N.C. Gen. Stat. § 50–20(d).

c.

■■■ The Commissioner finally contends that Decedent and Ms. Waters waived their right to equitable distribution in favor of a relinquishment of common law marital rights and that such relinquishment constituted the only consideration received by Decedent under the terms of the Agreement. We resolve this issue by reference to the language of the Agreement and by applying well-settled North Carolina canons of contract interpretation. If the language of the contract is clear and unambiguous, we interpret the contract as written and do not look beyond the terms to see what the parties' intent might have been. *Rosania v. Rosania*, 108 N.C.App. 58, 422 S.E.2d 348, 350 (1992); *Asheville Mall, Inc. v. F. W. Woolworth Co.*, 76 N.C.App. 130, 331 S.E.2d 772, 773–74 (1985). Furthermore, the various terms of a contract must be harmoniously construed, if possible, to give effect to every word and every provision. *Centennial Ins. Co. v. Haley Transfer & Storage, Inc.*, 18 N.C.App. 152, 196 S.E.2d 822, 828 (1973).

In this case, the Commissioner's understanding of the Agreement is not supported by language in the Agreement or the applicable North Carolina equitable distribution statute to which the Agreement makes explicit reference. As to the character of the rights supporting consideration, the Commissioner correctly notes that Section 3 of the Agreement specifies rights of dower, curtesy, and marital rights:

> 3. *Release of Property and Estate Rights.* Except as otherwise provided herein, each party hereby waives, relinquishes, renounces and quitclaims unto the other any and all rights, title, interest and control he or she may now have or shall hereafter acquire under the present or future laws of any jurisdictions, in, to and over the person, property or estate of the other, arising by reason of their prior marital relationship, *including, but not limited to the statutory and common law rights of dower, curtesy, statutory allowance, widow's allowance, homestead rights . . . .*

9. The Tax Court and Appellees misconstrue the import of *Hagler v. Hagler* given the facts of the instant case. In *Hagler*, the parties, rather than waiting until after the entry of a divorce decree or seeking equitable distribution from a court upon divorce, entered into a separation agreement disposing of their property prior to the dissolution of their marriage. *Id.* 354 S.E.2d at 231–32. Thus, the agreement in *Hagler* was governed by N.C. Gen.Stat. § 52–10.1. The Supreme Court of North Carolina, applying common law property principles, concluded that the agreement barred a subsequent action for equitable distribution pursuant to N.C. Gen.Stat. § 50–20. *Id.* at 232. The court further held that the agreement "fully disposed of the parties' property rights arising out of the marriage," *id.* at 235, and "effectuate[d] a complete waiver of claims by one party against the other." *Id.* at 234.

(J.A. 105) (emphasis added). Section 12 of the Agreement, however, explicitly recognizes the "common ownership" character of the property at issue by specific reference to the North Carolina equitable distribution statute:

> 12. *Property Settlement.* In full settlement of all the property rights and for the purpose of dividing their marital property *consistent with and pursuant to North Carolina General Statutes Section 50-20 et seq.*, and further acknowledging that a *species of common ownership* exists for their jointly owned property, the parties hereby divide their property ...

(J.A. 111) (emphasis added). The language in Section 3 referencing common law marital rights is of no consequence, for neither Decedent nor Ms. Waters had any residual common law marital rights at the time they executed the settlement. Section 12, however, recognized that upon divorce, the common law marital property rights of Ms. Waters and Decedent were converted by operation of law to community property interests: a present one-half ownership interest vested in each of the former spouses respectively. *See Johnson*, 346 S.E.2d at 434.[10] Thus, by the terms of the Agreement, Decedent and Ms. Waters equitably distributed their respective one-half ownership interests in accordance with North Carolina deferred community property principles.

Furthermore, the Commissioner's interpretation of the Agreement ignores, and indeed renders superfluous, the explicit language by which Decedent and Ms. Waters divided their property "consistent with and pursuant to" the North Carolina equitable distribution statute as codified at § 50-20.

To adopt the Commissioner's understanding would disregard a key provision of the Agreement and thus fail to give proper effect to its language or the meaning of the document as a whole. The waiver language upon which the Commissioner selectively relies is subject to a more rational interpretation given the Agreement as a whole: by executing the Agreement in accordance with N.C. Gen. Stat. § 50-20(d), Decedent and Ms. Waters waived any rights to future equitable distribution by judicial order or further agreement.[11] *See Hagler*, 354 S.E.2d at 234.

d.

We conclude that the North Carolina equitable distribution statute, N.C. Gen.Stat. § 50-20, vested in Decedent and Ms. Waters a common ownership interest in their marital property at the moment of filing for divorce. N.C. Gen.Stat. § 50-20(k). Upon divorce, any residual common law marital rights such as dower and curtesy were extinguished in favor of a community property interest in the marital property as defined in N.C. Gen.Stat. § 50-20(b)(1). *Johnson*, 346 S.E.2d at 433–34. Thus, at the time Decedent and Ms. Waters entered into the Agreement, rather than waiving any right to equitable distribution, they effectuated their statutory right under N.C. Gen.Stat. § 50-20(d) to consensual equitable distribution of their marital property.

2.

Our conclusion that the North Carolina equitable distribution statute governs this transaction has a direct effect on the character of the ownership interest at issue in the

---

**10.** Appellee's reliance on the decision of the Supreme Court in *United States v. Davis*, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), is thus unavailing. The community property rights created at the moment of divorce by application of the North Carolina equitable distribution statute constitute the type of "co-ownership" interests that the Court held were superior to those inchoate common law marital rights. *Id.* at 70, 82 S.Ct. at 1193.

**11.** This interpretation is further supported by the explicit language in Section 13 of the Agreement:

> 13. *WAIVER OF EQUITABLE DISTRIBUTION.* The parties acknowledge that a mutu-

ally satisfactory division has been made between them of all assets heretofore acquired by either of them. *Hereafter, each party shall. own, free of any claim, including the right to equitable distribution under the applicable North Carolina General Statute* all items of property of every kind which are now held or which may hereafter be acquired by either of them, and each party shall be free to dispose of the same as fully and effectively as if he or she were unmarried; therefore, the parties waive the right either may have to equitable distribution.

(J.A. 118–19) (emphasis added).

Agreement. The recognition of equitable distribution in the Agreement has a similarly important consequence as to the deductibility from the gross estate of Decedent's obligations specified in the Agreement. Thus, having discerned the character of this interest at issue in accordance with the law of Decedent's domicile, *Poe*, 282 U.S. at 109–10, 51 S.Ct. at 58–59, we now turn to federal law of estate taxation to determine how the transaction discharging the obligations specified in the Agreement shall be taxed. *Morgan*, 309 U.S. at 80–81, 60 S.Ct. at 425–26.

■ The transfer of the taxable estate of every decedent who is a citizen or resident of the United States is subject to federal estate tax. I.R.C. § 2001 (1988). The taxable estate, for the purposes of § 2001, is determined by deducting from the gross estate, among other items, amounts reflecting claims against the estate, I.R.C. § 2053(a)(3), and indebtedness of the estate, I.R.C. § 2053(a)(4).[12] Deductible claims or indebtedness are, however, limited to those arising from a bona fide contract supported by adequate and full consideration in money or money's worth. I.R.C. § 2053(c);[13] *see* *Natchez v. United States*, 705 F.2d 671, 673 (2d Cir.1983) ("[C]laims against an estate that are 'founded on a promise or agreement' will be deductible from the value of the gross estate if they are 'contracted bona fide and for an adequate and full consideration in money or money's worth'"); *Young v. United States*, 559 F.2d 695, 699 (D.C.Cir.1977) ("[A]ll claims against an estate founded upon a promise or agreement must be supported by full and adequate consideration."). Second, the Code limits the deductibility of claims from the gross estate to the extent they are not supported by adequate consideration, I.R.C. § 2043(a),[14] and completely disallows claims which rely on the relinquishment or promised relinquishment of marital rights as consideration. I.R.C. § 2043(b).[15]

12. I.R.C. § 2053 provides in pertinent part:
(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

\* \* \* \* \* \*

(3) for claims against the estate, and
(4) for unpaid mortgages on, or any indebtedness in respect of property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate, as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.
I.R.C. § 2053(a)(3)–(4).

13. I.R.C. § 2053(c) provides in pertinent part:
(c) LIMITATIONS.—
(1) LIMITATIONS APPLICABLE TO SUBSECTIONS (a) and (b).—
(A) CONSIDERATION FOR CLAIMS.—The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth;

\* \* \* \* \* \*

(2) LIMITATIONS APPLICABLE ONLY TO SUBSECTION (a).—In the case of the amounts described in subsection (a), there shall be disallowed the amount by which the deductions specified therein exceed the value, at the time of the decedent's death, of property subject to claims, except to the extent that such deductions represent amounts paid before the date prescribed for the filing of the estate tax return.
I.R.C. § 2053(c). The language of the applicable Treasury Regulation is substantially similar. *See* Treas. Reg. § 20.2053–4.

14. I.R.C. § 2043(a) provides in pertinent part:
**§ 2043. Transfers for insufficient consideration**
(a) **In general.**—If any one of the transfers, *trusts, interests, rights, or powers* enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefore by the decedent.
I.R.C. § 2043(a).

15. I.R.C. § 2043(b)(2), however, does contain a safe harbor provision that is inapplicable under the facts of this case. By reference to I.R.C. § 2516, "full and adequate consideration in money or money's worth" is deemed to exist if the divorce takes place "within the 3–year period beginning on the date 1 year before such agreement is entered into." I.R.C. § 2516. Decedent and Ms. Waters, however, failed to execute their *Support and Property Settlement* within the prescribed period.

Indeed, § 2043(b)(1) unequivocally states that marital rights do not constitute valid § 2053(c)(1)(A) consideration in money or money's worth:

> § 2043. Transfers for insufficient consideration
>
> \* \* \* \* \* \*.
>
> (b) Marital rights not treated as consideration.—
>
> (1) In General.—For purposes of this chapter, a relinquishment or promised relinquishment of dower or curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration "in money or money's worth".

I.R.C. § 2043.[16] The marital rights specified in the explicit statutory language "dower," "curtesy," "a statutory estate created in lieu of dower or curtesy," and "other marital rights in the Decedent's property or estate," are of an entirely different character from those community property interests divided by Decedent and Ms. Waters in the Agreement as discussed above. Dower and curtesy are clearly not at issue in the instant case, nor can the North Carolina equitable distribution scheme be construed as a codification of such interests. Furthermore, the language "other marital rights in the Decedent's property or estate" is based on the implicit assumption that at the time of the execution of the Agreement, the parties are still married. Thus, "other marital rights" for the purpose of determining whether a transfer or a claim was made for "consideration in money or money's worth" is limited to those rights conferred upon a surviving spouse by local law upon the death of his or her spouse. *Estate of Carli v. Commissioner*, 84 T.C. 649, 657, 1985 WL 15335 (1985) (holding that a wife's waiver, in an antenuptial agreement, of her community property interest in husband's earnings under California law constituted valid consideration); *Estate of Ellman v. Commissioner*, 59 T.C. 367, 371, 1972 WL 2419 (1972) ("[T]he phrase 'other marital rights' in section 2043(b) encompasses any support allowance due a widow under State law during administration of her husband's estate."); *cf. Estate of Rubin v. Commissioner*, 57 T.C. 817, 824–26, 1972 WL 2528 (1972) (wife's waiver, in an antenuptial agreement, of her dower or inheritance rights in Decedent husband's estate is not valid consideration for purposes of § 2043(b)), *aff'd*, 478 F.2d 1399 (3d Cir.1973); *Estate of Glen v. Commissioner*, 45 T.C. 323, 340–42, 1966 WL 1216 (1966) ("Section 2043(b) is not applicable to the relinquishment of a presently enforceable claim to an outright portion of a spouse's property upon divorce.").

Section 2043(b) was a considered legislative response to cases involving complicity between the husband and wife who remain married and who are merely attempting to avoid estate tax. *Natchez v. United States*, 705 F.2d 671, 674 (2d Cir.1983) (claim founded on a divorce decree is deductible even if based on the relinquishment of marital rights because the transfer is deemed an involuntary liability imposed on the estate, not by agreement, but by law).[17] Its purpose was to

---

16. The Commissioner's interpretation of a Treasury Regulation and its applicability to the property rights defined by North Carolina law must be accorded deference. *Commissioner v. Tufts*, 461 U.S. 300, 316 n. 17, 103 S.Ct. 1826, 1835 n. 17, 75 L.Ed.2d 863 (1983). However, "this principle of deference, while fundamental, only sets the 'framework for judicial analysis; it does not displace it.'" *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982) (quoting *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967)). Furthermore, we note that the language of the applicable Treasury Regulation, Treas. Reg. § 20.2043–1, is substantially identical to that set forth in I.R.C. § 2043(b). Thus, because we can measure the Commissioner's interpretation against the specific provision in the Code, we owe the interpretation less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision. *Rowan Companies, Inc. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981). We note that although Congress overruled the holding of *Rowan* as it applied to claims for refund of FICA taxes on salary reductions, *See Temple University v. United States*, 769 F.2d 126, 133 (3rd Cir.1985), the interpretive principle upon which we rely in this appeal was not affected.

17. The purpose of this legislative response to complicity between married couples is reflected in the explicit language of the legislative history

eliminate the practice of contractually converting the property rights accorded a surviving spouse into deductible claims against the decedent spouse's gross estate. *Estate of Glen*, 45 T.C. at 333.

This record reflects no complicity between Decedent and Ms. Waters to perpetuate the evil addressed by § 2043. Indeed, the parties agree, and the Tax Court found, that the negotiations between Decedent and Ms. Waters were adversarial in nature, and that the resulting Agreement constituted a bona fide, arm's length transaction. Decedent and Ms. Waters were, therefore, separated by divergent interests. *Bank of New York v. United States*, 526 F.2d 1012, 1016–17 (3d Cir.1975) ("[A]uthorities upholding the deductibility of claims against the estate appear to involve the sort of agreements that arise between parties separated by divergent interests."). We further note that at the time the Agreement was executed by the parties, the State Court issuing the divorce decree continued to retain jurisdiction to impose judicially equitable distribution should the parties fail to effectuate distribution by agreement. These facts are particularly significant in light of the decision of the United States Court of Appeals for the First Circuit in *McMurtry v. Commissioner*, 203 F.2d 659, 662 (1st Cir. 1953):

> Property settlements in contemplation of divorce lack the familiar characteristics of a gift. They are usually the product of arm's-length bargaining negotiations between the parties or their representatives. If the parties cannot work out and submit to the divorce court the terms of an agreed

property settlement—which they might naturally prefer to do if possible—the divorce court, if empowered by state law to do so, will make one for them. Therefore in a real sense such settlement agreements are not "voluntary," nor in the donative spirit, but rather are made under the compulsion of the impending divorce decree, the marriage having gone on the rocks. The motive of such transfers is certainly not to deplete the estate *inter vivos*, so as to escape ultimate estate taxes upon death.

Although the instant facts involve an extant divorce as opposed to the "impending" divorce in *McMurtry*, Decedent and Ms. Waters nevertheless were similarly motivated by the prospect that one of them, if dissatisfied with the result of negotiations, would seek equitable distribution by the State Court with all the expense and risk entailed by that litigation.

The North Carolina equitable distribution statute, N.C. Gen.Stat. § 50–20, vested in Ms. Waters community property rights at the moment of divorce, interests not contemplated either in the explicit text of § 2043(b) or its legislative history. Thus, § 2043(b) is simply inapplicable to the instant facts. Rather, we hold that the division of property effectuated by Decedent and Ms. Waters is more akin to an arm's length exchange of particular items of property amounting to an equitable non-taxable division of commonly owned property. *Imel v. United States*, 523 F.2d 853 (10th Cir.1975) (where transaction was merely a division of property among co-owners, given wife's "species of common in-

stated in the report of the Senate Finance Committee:

> This amendment excludes, in determining "*consideration in money or money's worth*," the value of a relinquished, or a promised relinquishment of dower, curtesy, or other marital rights in decedent's property. Section 302(a) and (b) of the 1926 Act require the value of such an interest to be included in the gross estate, and if its value may, in whole or in part, constitute a consideration for an otherwise taxable transfer (as has been held to be so), or an otherwise unallowable deduction from the gross estate, the effect produced amounts to a subversion of the legislative intent expressed in section 302(a) and (b).
> For example, a decedent dies leaving an estate of $1,500,000 (after payment of all charges),

> and under the State law the surviving spouse is entitled to one-third, or $500,000, of which she cannot be deprived by will without her consent. Under existing law the estate is entitled to no deduction on account of her statutory rights, but, if she and decedent had entered into a contract by which she was to receive from his estate a stated sum in consideration of a waiver of her statutory rights, the amount due her under the contract might be held a deductible claim against the estate as having been contracted for an adequate and full consideration in money's worth, namely, the value of her waived marital rights.

S. Rep. No. 665, 72nd Cong., 1st Sess., pt.2, at 532 (1932).

terest" of marital estate vesting at time of filing for divorce, no taxable event occurred); *Collins v. Commissioner,* 412 F.2d 211 (10th Cir.1969) (division of property jointly acquired during marriage, held under a species of common ownership, is a nontaxable division of property between co-owners).

■ Nevertheless, because Ms. Waters's share of the property specified in the Agreement became claims against the Estate upon the death of Decedent, the Agreement is subject to the adequate and full consideration requirements of I.R.C. § 2053(c). Given the stipulation of the parties and the finding of the Tax Court that the negotiations between Decedent and Ms. Waters were adversarial in nature, and that the resulting Agreement constituted a bona fide arm's length transaction, we agree that claims against the estate arising from the Agreement were "contracted for bona fide" in accordance with I.R.C. § 2053(a).

Because the Tax Court disposed of this issue exclusively on the basis of its § 2043(b) analysis, it failed to consider, as required by I.R.C. § 2053(c)(1)(A), whether the claim against the Estate was founded on an agreement "for an adequate and full consideration in money or money's worth." The Tax Court also failed to perform any potential § 2043(a)

calculations should the consideration be found inadequate. These questions remain to be resolved by the trial court.

## B.

■ As to the *inter vivos* transfer of the life insurance policy, the question before us is whether the proceeds of the policy should, as a threshold matter, be included in the gross estate for the purpose of calculating the Estate's § 2001 tax liability. The Tax Court held that the proceeds of the policy were includable in Decedent's taxable estate pursuant to I.R.C. § 2035(a).[18] The Estate, however, contends that the transfer of the insurance policy resulted in the creation of an implied contract between Decedent and Ms. Waters for valuable consideration in money or money's worth and is, therefore, excludable from the estate as a "bona fide sale for an adequate and full consideration in money or money's worth." I.R.C. § 2035(b)(1).[19] Thus, the Estate argues that the $200,000 policy should be excluded from Decedent's estate pursuant to I.R.C. § 2035(b)(1). This contention, however, has no merit. The record reflects that Ms. Waters became concerned about how she would support herself and her children if Decedent were to die before they finalized their sup-

18. I.R.C. § 2035(a) provides in pertinent part:
**§ 2035. Adjustments for gifts made within 3 years of decedent's death**
(a) **Inclusion of gifts made by decedent.**—Except as provided in subsection (b), the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3–year period ending on the date of the decedent's death.
I.R.C. § 2035(a).
In support of its holding the Tax Court noted the general rule of § 2035(a)—that transfers of property within three years of death shall be presumed to be in contemplation of death and includable in the estate. The Tax Court also observed that, pursuant to § 2035(d)(1), Congress eliminated, in general, the three-year rule of includability for estates of Decedents dying after December 31, 1981. Section 2035(d)(2), nevertheless, provides an exception to that exclusion. Specifically, the Tax Court noted that § 2035(d)(2) provides that the exclusion of the three year rule for such decedents does not apply " 'to a transfer of an interest in property which is included in the value of the gross estate under

§ 2036, 2037, 2038, or 2042 or would have been included under any of such section if such interest had been retained by the decedent.' " (J.A. 304–05.) Because the insurance policy would have been includable in Decedent's gross estate under § 2042 had he died owning it, the Tax Court concluded that the value of the policy would have been includable in his estate if he had not transferred it to his former wife. The transfer having been effectuated in 1986, within three years of Decedent's death in 1988, the Tax Court concluded that the proceeds of the policy were includable in the taxable estate under § 2035(a). We do not review the above analysis, however, because it is not at issue in this appeal.

19. I.R.C. § 2035(b) articulates an exception to the general rule of inclusion for gifts made within three years of decedent's death. It provides in pertinent part:

(b) **Exceptions.**—Subsection (a) shall not apply—
(1) to any bona fide sale for an adequate and full consideration in money or money's worth ....
I.R.C. § 2035(b)(1).

port and property agreement. At Ms. Waters's request, Decedent, on April 3, 1986, transferred to her a $200,000 life insurance policy issued to Decedent in 1983 by Southwest Life Insurance Company. Ms. Waters did not give Decedent, or relinquish her entitlement to, any property or money in return for this life insurance policy. Furthermore, the insurance policy was not referenced in the later Agreement whereby Decedent and Ms. Waters divided the commonly held property. These facts reflect no bargained-for exchange that might allow the transfer in question to be characterized as one supported by the requisite consideration to be excluded from the Estate under I.R.C. § 2035(b). Because we agree with the Commissioner's contention that these facts reflect no bargained-for exchange as required under federal tax law, and the Estate makes no other argument for exclusion, we hold that the transfer of the life insurance policy is subject to the general rule of includability set forth in I.R.C. § 2035(a).

### III.

As to the transaction involving those items of property enumerated in the Agreement, because the Tax Court erred in its interpretation of the North Carolina statutory scheme and in its § 2043(b) analysis, we reverse and remand for proceedings in accordance with this opinion. With respect to the life insurance policy, the Tax Court properly determined that the transfer was subject to I.R.C. § 2035(a). We, therefore, affirm on this issue.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*